**Michael Colby WILDER, a minor by next friend and mother, Mrs. J. B. Crosson, Appellant,**

**v.**

**AETNA CASUALTY AND SURETY COMPANY, Appellee.**

Supreme Court of Tennessee.

Feb. 7, 1972.

**2**

Don Wyatt, Fayetteville, for appellant.

Simms & Simms, Fayetteville, for appellee.

## OPINION

**HUMPHREYS, Justice.**

This is an appeal in error from the decree of the Chancellor denying recovery of death benefits under the Workmen's Compensation Law. The parties will be referred to as they appeared in the court below.

The petitioner, Michael Colby Wilder, is the illegitimate son of Colby C. Wilder, the deceased workman. It is conceded that Colby C. Wilder died as a result of an accident arising out of and in the course of his employment, and that he was covered by and subject to the Workmen's Compensation Law. The defendant, Aetna Casualty and Surety Company, the Workmen's Compensation insurance carrier for the deceased's employer, resists payment on the sole ground that Michael Colby Wilder is not a dependent under the Workmen's Compensation Law.

There is no substantial dispute as to the facts, which, as found by the Chancellor in his memorandum opinion are set out below.

" . . . The petitioner who was born out of wedlock June 30, 1954 is the son of the deceased workman who never legitimated him but always recognized him. Bigaha Bernice Crosson, the workman's mother, along with J. B. Crosson, his stepfather, took charge of petitioner in 1957 and have had exclusive custody of him ever since. In 1959 the Crossons adopted the petitioner in Indiana where they were all domiciled. Indiana has a modern adoption statute substantially similar to ours. The mother of the child formally surrendered him in the Indiana proceeding but the father did not and was not a party. However, he knew about the proceeding, encouraged it and never objected to it. After the adoption the petitioner retained the same name as before and there was no actual change in his personal relationship with his father. The change was whatever legal effect the adoption had.

"Wilder had made some contributions to the child's support before the adoption which he continued. However, they were not regular and did not amount to much. During the period preceding Wilder's death, 1962 to 1969, the Crossons lived in Florida where Mr. Crosson drew social security benefits and Mrs. Crosson worked at gainful employment. The Crossons were capable of providing and did provide a reasonable support for petitioner during this time."

The Chancellor went on to hold that the petitioner was not a child conclusively presumed to be dependent under T.C.A. § 50–1013(a) (1), and that the proof showed that he was not an actual dependent under T.C.A. § 50–1013(a) (3) or § 50–1013(b).

With respect to the first holding of the Chancellor, we agree. It was early held that T.C.A. § 50–1013(a) (1), providing that "minor children under the age of sixteen (16) years" are conclusively presumed to be dependent, applied only to legitimate children. Portin v. Portin, 149 Tenn. 530, 261 S.W. 362 (1923); Sanders v. Fork Ridge Coal & Coke Co., 156 Tenn. 145, 299 S.W. 795 (1927). Under these cases, illegitimate children were entitled to death benefits only when they were proved to be actually dependent upon the deceased workman. In the *Sanders* case a contrary result in England was distinguished on the ground that by statute England "for many purposes. . . . puts an illegitimate child in the same position

as a legitimate child." 156 Tenn. 145, 148, 299 S.W. 795, 796.

Then, in Shelley v. Central Woodwork, Inc., 207 Tenn. 411, 340 S.W.2d 896 (1960), it was held that the Bastardy Act of 1955 (T.C.A. § 36–222 et seq.), which made the father of an illegitimate child responsible for its necessary support and education, operated to bring an illegitimate child within the class of children conclusively presumed to be dependent by virtue of T.C.A. § 50–1013(a) (1). Thus the sole basis for including an illegitimate child within the conclusive presumption of dependency is the statutory duty imposed upon the father by the provisions of the Bastardy Act.

There can be little doubt that in this case the adoption of Michael Colby Wilder by his paternal grandparents removed from the deceased any legal duty for the support of his illegitimate son. The Indiana statute, under which the decree of adoption was handed down, provides:

"3–122. *Effects of adoption.*—The natural parents of such adopted person, if living, shall after such adoption be relieved of all legal duties and obligations due from them to such person and shall be divested of all rights with respect to such person: Provided, That when the adoptive parent of a child shall be married to a natural parent of the child the parental relationship of such natural parent will be in no way affected by such adoption. After such adoption such adopting father or mother or both shall occupy the same position toward such child that he, she or they would occupy if the natural father or mother or both, and shall be jointly and severally liable for the maintenance and education of such person." Burns Ind.Stat.Ann., § 3–122 (1967), IC 1971, 31–3–1–9.

■ We must, of course, give effect to the Indiana decree, insofar as it establishes the status of Michael as an adopted child. Finley v. Brown, 122 Tenn. 316, 123 S.W. 359 (1909). Under that decree, it is clear that any duty toward the child on the part of the deceased workman was abolished. Our own statute, T.C.A. § 36–126, while not so explicit, appears to accomplish the same result. It provides that "The signing of a final order of adoption establishes from that date the relationship of parent and child between the adoptive parents and the adopted child as if the adopted child had been born to the adoptive parents in lawful wedlock . . . An adopted child shall not inherit real or personal property from a natural parent or relative thereof *when the relationship between them has been terminated by adoption.* . . ." (Emphasis added). Whether tested under the Indiana statute or our own, we feel that it is clear that the decree of adoption so terminated the legal relationship between Michael and his natural father that the provisions of our Bastardy Act can no longer have the effect of bringing him within the class of children conclusively presumed to be dependent under T.C.A. § 50–1013(a) (1).

■ While we are in agreement with the Chancellor that Michael is entitled to no conclusive presumption of dependency, we must disagree with that part of his decree relating to actual dependency. The only proof introduced in the court below which touched on the question of Michael's actual total or partial dependency was contained in the discovery deposition of his adoptive mother and natural grandmother, Mrs. J. B. Crosson. In this regard the parties had stipulated "that the deceased employee, Colby C. Wilder, contributed to the support of the minor complainant, Michael Colby Wilder, and if the same should become material in this cause the parties hereto may offer proof as to the amount of support furnished or per cent thereof. . . ." The Chancellor declined to hear proof under the stipulation, holding that "the proof already in shows the contributions spoken of were not of the sort to establish partial dependency."

The testimony of Mrs. Crosson upon which the Chancellor's ruling was based is set out below:

DIRECT EXAMINATION BY: MR. ROBERT W. SIMMS.

"Q. I believe you said your son had on occasions supported this child?

"A. Yes, he has always helped me, but no certain amount.

"Q. After you adopted the child, did he continue to support or help you with the child?

"A. Yes.

"Q. Had he helped you and your husband any with finances prior to that?

"A. Yes, he has.

"Q. He had contributed to your support and your husband's support also, is that true?

"A. Yes, he has helped all of us with things that we needed, especially my glasses. When I broke my glasses it cost me $50.00. He gave me money for my glasses.

"Q. After the child Michael Colby Wilder came into your home, he continued to send funds, is that what you are saying?

"A. Yes, he has always helped.

"Q. During the year 1969, do you have any record of how much he has supported you, your husband, and the child?

"A. I don't have a record of it. No sir, I don't have a record of it. He would give us $20.00 at a time, $10.00 at a time, and he drove quite often for the Towry Company to Miami, Florida.

"Q. But you have no records of—

"A. Not at that time.

"Q. You did not keep any records of the year 1969?

"A. No, I did find an old record I kept I believe in 1965, which I was very careful about my income tax. That I do have with me.

"Q. Let me ask you then before we get to 1965. During the year 1968 did you keep any records as to any funds furnished by your son, Colby Wilder, either you, your husband, or the child, Michael Colby Wilder?

"A. I didn't keep a record of that no. We all loved him.

"Q. So actually—

"A. We all saw he had what he needed.

"Q. Then the year prior to that then, what about 1967, did you keep any records then?

"A. The only thing that I remember in 1967, don't know if I can get that. I remember in the month of September he wired $60.00 from Fayetteville. I don't know if the Western Union keeps a record of that. I don't have a record, but that is all that I can remember that I could have record that I could chase down a record to find.

"Q. What was the purpose of that?

"A. For Michael's school clothes.

"Q. In—

"A. That was in 1967.

"Q. In 1967, you do remember the $60.00.

"A. Yes.

"Q. Other than that, you don't have any record of any contributions?

"A. No.

"Q. What about the year 1966, do you have a record of any contributions made either to you, your husband, or the child?

"A. Nothing only just oral statements.

"Q. Made by Colby Wilder, any records?

"A. No written record, no sir.

"Q. And prior to that, 1965 or prior, do you have any record of any contributions made?

"A. I believe the only written records that I do have is—I believe what I have is dated 1965.

"Q. In other words, for the year 1964 or prior years, you don't have any written records but you do have something for the year 1965?

"A. Yes.

"Q. How much in dollars and cents did he furnish to you, your husband and your adopted child in the year 1965?

"A. I will have to look at the book to tell you exactly. (looking at book) I have got from February to September. I can tell you

(MR. WYATT: JUST READ THEM OFF MRS. CROSSON)

"A. On February 13th, 18.00; February 20th, 40.00; February 26th $30.00; on March 12th, 3.00; March 19th, 16.00; March, no April 17th, 20.00; April 24th 10.00; May 26th, 50.00; June 11th, 23.00; July 24th, 10.00; August 23rd, 5.00 and in September, 15.00, and on this opposite page from February up to May he was working for Commercial Carriers, and he stopped by my house once a week or every 10 days. I washed his clothes, and he gave me $10.00 every week for his board and Michael, or he gave me for the child which was $10.00, $20.00, $30.00, $40.00, $5.00, $10.00, that was $110.00.

"Q. Now, that all that $110.00—he was living with you?

"A. Just stopping in and getting his clothes.

"Q. And you were washing his clothes and that was in the nature of room and board is that right?

"A. Hes, that was, I will have to say that was for some services for him, which lots of time he came in and out and load and go on."

CROSS EXAMINATION
BY MR. DON WYATT:

"Q. Mrs. Crosson, you stated that your son had contributed to his support throughout the time you had the child?

"A. That's right.

"Q. You have a record and have given us figures of what he contributed in 1965. Would you say that he had contributed this much or more during the time you had the child?

"A. I would say he had contributed that much or more.

"Q. Throughout all this time had he been sending you money for his support?

"A. That's right."

From the above it appears that in the eight month period during which Mrs. Crosson kept written records of the deceased's contributions he paid a total of $240.00 directly for his son's support, not including perhaps some part of an additional $110.00 during the same period, regular contributions averaging at least $30.00 a month. Mrs. Crosson testified that the deceased had contributed that much or more throughout the time she and her husband had had the child. The record is completely silent as to the amount otherwise expended for Michael's support; i. e., there is no basis in the record for determining what percentage of the cost of Michael's support his father's contributions might have amounted to. The absence of such proof, in view of the above mentioned stipulation, constrains us to hold that there is no material evidence in the record to support the Chancellor's finding of no actual dependency under T.C.A. § 50–1013(a) (3) or § 50–1013(b).

It follows that the case must be remanded to the trial court for the taking of proof on the issue of Michael Colby Wilder's actual dependency upon his deceased father, and for the rendition of such judgment as may be appropriate thereon.

DYER, C. J., CRESON and McCAN-LESS, JJ., and JENKINS, Special Justice, concur.