In re ADOPTION OF Thomas Stevenson
BOWLING, II, Muriel Ahlers,
Petitioner-Appellee,

v.

Jimmy Ralph BOWLING,
Respondent-Appellant,

and

Thomas Bowling and Wife, Evelyn R.
Bowling, Intervenors-Appellants.

Supreme Court of Tennessee.

March 1, 1982.

Jerry P. Black, Jr., Knoxville, for respondent-appellant.

Joseph J. Levitt, Jr., Knoxville, for intervenors-appellants.

Charles D. Mounger, Charles E. Rader, Knoxville, for petitioner-appellee.

## OPINION

BROCK, Justice.

In this case Jimmy Ralph Bowling opposes the termination of his parental rights and the adoption of his son Tommy (Thomas Stevenson Bowling II) by the child's maternal grandmother, Muriel Sweet Keck Ahlers. The child's paternal grandparents, Thomas Stevenson Bowling and Evelyn Ruth Bowling, also oppose the adoption. The child's mother was murdered by her husband, Jimmy Bowling, on November 19, 1975.

### I

A month after Jimmy Bowling killed his wife, Tommy's paternal grandparents, the Thomas Bowlings, petitioned in Chancery Court to adopt the child. Ms. Ahlers intervened, also seeking to adopt the boy. In January, 1976, Ms. Ahlers was granted custody of Tommy by the Knox County Juvenile Court. The Bowlings took a voluntary

nonsuit in the Chancery Court case in March, 1976. Thereupon, the Chancery Court ordered that Ms. Ahlers' intervening adoption petition be dismissed, that custody be awarded to Ms. Ahlers, and that visitation privileges be granted to the Thomas Bowlings. The instant proceeding was begun in August of 1976 when Ms. Ahlers petitioned in the Chancery Court for Knox County to adopt Tommy. The child's father opposed the adoption and a full hearing was held.

In February, 1977, the court entered a memorandum opinion finding that Jimmy Bowling had abandoned his son.[1] The court ordered termination of Jimmy Bowling's parental rights and decreed the adoption of the child by Ms. Ahlers. Before this decree became final the Thomas Bowlings intervened. They asserted that they had not been parties to the proceeding, although they had been present and had testified at the hearing, and that the order improperly cut off their visitation rights.

After a second hearing, the court rendered a second memorandum opinion, in September, 1978, in which the court again found that Jimmy Bowling had abandoned his son. In the second memorandum opinion the Chancellor based his finding of abandonment on defendant's continued course of neglect and violent conduct. The court dismissed the Bowlings' intervening complaint in November, 1978, and entered a second decree of adoption. The Court of Appeals affirmed this final decree.

Jimmy Bowling contests the holding of the lower courts that he abandoned his son within the meaning of the adoption statutes, T.C.A., §§ 36–101 et seq. and he challenges the decree of adoption of his son.

II

What constitutes "abandonment" for purposes of adoption? At the time of these proceedings "abandonment" was defined in

the Code in the chapter on adoption as follows:

"36–102. Definitions. — . . . .

\* \* \* \* \* \*

"(5) For the purpose of this chapter an 'abandoned child' shall be:

"1. A child whose parents have willfully failed to visit or have willfully failed to support or make payments toward his support for four (4) consecutive months immediately preceding institution of an action or proceeding to declare the child to be an abandoned child; or

"2. When, as the result of a petition filed in the juvenile court the court has found a child to be a dependent and neglected child as defined in § 37–242, removed the child from the home of the parents and placed the child in the temporary custody of the state department of human services or the licensed child-placing agency and for a period of four (4) months the department or agency has given assistance to the parents in an effort to establish a suitable home for the child, as the result of a petition filed in the chancery or circuit court by the department of human services or the agency and the parents are duly before the court by service of process, the court finds that the parents have made no effort to provide a suitable home, have shown a lack of concern as to the child's welfare and have failed to achieve a degree of personal rehabilitation as would indicate that, at some future date, they would provide a suitable home for the child, the chancery or circuit courts shall have jurisdiction to decree the child an abandoned child, to terminate the parental rights and appoint a duly authorized representative of the de-

---

1. In his first memorandum opinion the Chancellor based his finding of abandonment on the act of murder:

"By the act of murdering the child's mother, Defendant committed an intentional and willful act clearly demonstrating an intent to renounce his parental duties and obligations to the child. [ . . . ] He has abandoned the child *by his act of murder*." (Emphasis added.)

partment of human services or the licensed child-placing agency having custody of the child with authority to place the child for adoption and to consent to the adoption in loco parentis."

Since the child in this case has not been declared dependent and neglected as set out under paragraph (2), we are not directly concerned with that provision.

The Court of Appeals held that the statutory definition contained in paragraph (1) of subsection (5) was not applicable and applied the following definition instead:

"Abandonment imports any conduct on the part of the parent which evinces a settled purpose to forego all parental duties and relinquish all parental claims to the child." (Citing *Ex Parte Wolfenden*, 49 Tenn.App. 1, 349 S.W.2d 713 (1959).)

The court held that when a parent murders his or her spouse, the other parent, and is sentenced to prison for a substantial period of time, he has thereby abandoned his child.

The definition of abandonment employed by the Court of Appeals was first laid down in 1959 in an opinion written by Judge Allison Humphreys, who later served with distinction as a member of this Court, in *Ex Parte Wolfenden*, 49 Tenn.App. 1, 2, 349 S.W.2d 713, 714 (1959), as follows:

"So, the issue of abandonment should be resolved by the Circuit Court under the following statement of the law:

'Abandonment imports any conduct on the part of the parent which evinces a settled purpose to forego all parental duties and relinquish all parental claims to the child. It does not follow that the purpose may not be repented of, and, in proper cases all parental rights again acquired.... But when abandonment is shown to have existed, it becomes a judicial question whether it really has been terminated, or can be, consistently with the welfare of the child.' 1 Am.Jur., Adoption of Children, § 42." 349 S.W.2d at 714.

Certiorari review of the decision of the Court of Appeals in *Wolfenden* was sought but denied by this Court.

In this same *Wolfenden* decision the court further held that the statutory definition of abandonment contained in subparagraph (1) of subsection (5) of T.C.A., § 36–102, was, by its terms, applicable only to "an action or proceeding to declare the child to be an abandoned child," and had not been extended to adoption proceedings by either legislative amendment nor by court construction. In thus restricting the application of the definition contained in subparagraph (1) of subsection (5), above, and in adopting the somewhat broader definition of abandonment for application in adoption cases, above quoted, the court noted that it was but carrying out the policy indicated by the decision of this Court in *Young v. Smith, et al.*, 191 Tenn. 25, 231 S.W.2d 365 (1950) wherein this Court held that consent of a parent to the adoption of his child could be inferred from the parent's actual abandonment of the child even though the statute expressly required the parent's written consent.[2]

 These important determinations with respect to abandonment in adoption cases have been standing unaltered for the past 23 years since the *Wolfenden* decision was handed down; we are given no good reason to alter them now and we decline to do so.

### III

The issue before us is whether the conduct of Jimmy Ralph Bowling, as found by the Chancellor and affirmed by the Court of Appeals, constitutes an abandonment of his child under the definition of that term which we have hereinabove adopted. Upon this issue the holding of the Court of Appeals was as follows:

"We hold that when one parent murders his or her spouse and is subsequently

2. *See, also,* T.C.A., § 36 101, which provides: "When the interest of a child and those of an adult are in conflict, such conflicts should be resolved in favor of the child; and to that end this chapter be liberally construed."

sentenced to prison for a substantial period of time, such conduct evinces a settled purpose to forego all parental duties and relinquish all parental claims to the child. Therefore, in the case at bar, Jimmy Ralph Bowling has abandoned his son by virtue of his act of murdering the child's mother and his subsequent prison sentence of 40 years."

■ If the Court of Appeals is holding that the father's murder of the child's mother and his subsequent imprisonment for 40 years constitutes an abandonment as a matter of law, we are not in complete agreement with that conclusion. However, we do conclude that the father's murder of the child's mother and his subsequent sentence of imprisonment of 40 years, coupled with the father's entire course of conduct of neglect, failure to support his family and his repeated acts of violence and criminal conduct toward members of the family do support the finding of abandonment made by the lower courts. The record supports findings by the Chancellor that Jimmy Bowling, although able to work, did so only very sporadically and that he contributed practically nothing for the support of his family, including the subject child; that most of the support of the child was provided by his murdered wife and her parents; that the murder of his wife and his sentence to 40 years imprisonment therefor were not isolated events, but that he had previously been convicted of a felonious assault in 1970 upon a member of his wife's family and that he is serving at the present time not only the 40 years sentence for murder of his wife but also a concurrent sentence for rape; and that he has always displayed little concern for his family, including his son, but has, on the contrary, displayed an attitude of irresponsibility toward his family.

The Chancellor summarized his finding of abandonment in his last memorandum opinion as follows:

"Upon a reconsideration of all the facts it is again concluded that the father abandoned the boy. His murder of the mother and his resulting imprisonment were not an isolated incident, but were end results of a course of neglect and violence. At some point the actions of an individual speak louder than his words. That point was reached and passed in this case. The father's neglect, violence and criminal conduct led to the finding of abandonment."

We affirm both the Chancellor's finding of facts and his conclusion that they demonstrated abandonment by the father of the subject child. *Accord: Loar Adoption*, 56 Pa.D. & C.2d 618 (1972); *Hamby v. Hamby*, 264 S.C. 614, 216 S.E.2d 536 (1975); *In Re Adoption of Dobbs*, 12 Wash.App. 676, 531 P.2d 303 (1975); *Hutson v. Haggard*, Texas Civ.App., 475 S.W.2d 330 (1971). For cases dealing with this general subject matter see annotations at 78 A.L.R.3d 712, 79 A.L.R.3d 417.

### IV

■ The Thomas Bowlings assert that when the Chancellor dismissed their intervening complaint and ordered the child's adoption he improperly terminated the visitation rights they had been granted in 1976 in the prior Chancery Court case. The Chancellor's second memorandum opinion in the instant case shows, however, that the court expressly declined to rule on the issue:

"The petition of Mrs. Ahlers in this case only requires a determination of whether her adoption of the boy shall be approved. The matter of visitation by the Bowlings following adoption involves issues of law and fact that *need not be decided* in the case. What effect the adoption may have upon visitation by the paternal grandparents is a question *properly left to determination in the case in which visitation was granted*, and accordingly it is." (Emphasis added.)

Apparently the Chancellor intended that the Bowlings' complaint be dismissed only insofar as it was an attempt to block the adoption and did not intend that his order resolve the issue of visitation rights. The Chancellor clearly had the authority, however, to resolve this question. The Thomas

Bowlings were present in this case as witnesses at the first hearing and as parties at the second hearing. When a petition to adopt is filed, the child becomes "a ward of the court and the court shall have jurisdiction of *all matters* pertaining to the child." T.C.A., § 36–106. The statutes contemplate that the adoption proceeding shall end any uncertainty concerning the child's status. *See also* T.C.A., § 36–101 (prevention of subsequent disturbance of the relationship between child and adoptive parents); 36–125 (necessary parties to be before the court); 36–126 (establishment of new parent-child relationship from date of adoption); 36–127 (adoptive parents not to be subsequently deprived of rights concerning child). The Chancellor erred, therefore, in referring the question of the Bowlings' visitation rights back to the earlier Chancery Court case. *Cf. In Re Adoption of Dearing,* 572 S.W.2d 929 (Tenn.Ct.App. 1978).

We find without merit the Bowlings' arguments that because of the 1976 Chancery Court case their visitation rights may not now be terminated. In the prior case the Bowlings took a voluntary nonsuit and were granted visitation. The Bowlings argue that the judgment was a "consent judgment" that establishes as *res judicata* their right to visit the child. The record does not support this contention; the court's order states that the motion to dismiss Ms. Ahlers' intervening petition was made jointly by counsel for Jimmy Bowling and counsel for the Thomas Bowlings. The fact that Ms. Ahlers did not appeal does not make the judgment a "consent judgment." Since no issues were litigated, *res judicata*

does not apply. Nor is Ms. Ahlers estopped to interfere with the Bowlings' visitation rights, since her intervening petition in the prior case was dismissed without prejudice.

The Court of Appeals held that under Chapter 11 of Title 36 of the Code, "Grandparents' Visitation Rights," the adoption order terminated the Bowlings' visitation rights. That chapter provides that when a child's mother or father is deceased the parent *of the deceased person* may be granted visitation rights. T.C.A., § 36–1101.[3] Such rights are terminated if the child is adopted. T.C.A., § 36–1102.[4] Because the Bowlings are not the parents of the deceased mother, their visitation rights were not granted pursuant to this chapter [5] and § 36–1102 does not apply to cut off their rights.

We do think, though, that as a general rule court-ordered visitation rights of relatives will be terminated by an adoption. An adoption severs all legal consequences and incidents of the natural parent-child relationship. It terminates the natural parent's rights concerning the child. T.C.A., §§ 36–126, 36–127; *Grider v. Grider,* 182 Tenn. 406, 187 S.W.2d 613 (1945); *In Re Adoption of Dearing, supra; Rogers v. Baldridge,* 18 Tenn.App. 300, 76 S.W.2d 655 (1934). *See also Wilder v. Aetna Casualty & Surety Co.,* 477 S.W.2d 1 (Tenn.Ct. App.1972). *See generally* 2 C.J.S. *Adoption of Persons* § 139 (1972). It follows that the adoption generally will also sever the parent's parents' (the grandparents on that side of the family) rights concerning the

---

**3.** T.C.A., § 36 1101, provides:

"*Grandparents' visitation rights—Grant by court.*—If either the father or mother of an unmarried minor child is deceased, or if the child's father and mother are divorced, the parents of such deceased person or the parents of either of such divorced persons may be granted reasonable visitation rights to the child during its minority by the court of competent jurisdiction upon a finding that such visitation rights would be in the best interests of the minor child."

**4.** T.C.A., § 36- 1102, provides:

"*Effect of adoption.*—This chapter shall not apply if the child has been adopted by a person other than a stepparent. Any visitation rights granted pursuant to this chapter prior to the adoption of the child shall be automatically terminated upon such adoption."

**5.** The visitation rights apparently were granted under the authority of T.C.A., § 36–106 (adoption petition gives court jurisdiction over all matters concerning child) and § 36–123 (child remains ward of the court upon dismissal of adoption proceeding).

child.[6] *Matter of Adoption of Gardiner,* Iowa, 287 S.W.2d 555 (1980); *People ex rel. Bachleda v. Dean,* 48 Ill.2d 16, 268 N.E.2d 11 (1971); *Browning v. Tarwater,* 215 Kan. 501, 524 P.2d 1135 (1974). *See generally* Am.Jur.2d *Adoptions* § 85 (1962). *Contra* 2 C.J.S. *Adoption of Persons* § 140 (1972). On remand the Chancellor should apply these principles in deciding the visitation issue.

Accordingly, we affirm the decree of adoption, but remand for further proceedings respecting the issue of visitation. Costs are taxed against Jimmy Ralph Bowling and surety, if any.

HARBISON, C. J., and FONES, COOPER and DROWOTA, JJ., concur.

---

**6.** The legislature has provided an exception to the general rule in the case of grandparents whose child (the parent) was divorced or deceased. Under T.C.A. §§ 36–1101 and 36–1102 those grandparents may still request visitation rights even after the grandchild has been adopted by a stepparent. Additionally, there may be rare or peculiar circumstances that cause continued visitation by certain relatives to be in the child's best interests and a complete, abrupt severance of all of the child's family ties to be contrary to his interests; but since such a case has not arisen in the Tennessee courts, we leave consideration of this issue to a future date. *See People ex rel. Simmons v. Sheridan,* 98 Misc.2d 328, 414 N.Y.S.2d 83 (Sup.Ct.1979) and cases cited therein. Nor does this case present any reason to depart from the general rules, as the Chancellor found that

"At the time [Ms. Ahlers] received custody of the boy he was depressed, cried a lot, and was hard to manage. Since living with her, he has generally returned to normal, except that when he returns from visitation with his paternal grandparents he is difficult to manage."