Ray A. KOIVU, Jr., and wife Georgeanna Koivu, Petitioners-Appellants,

v.

Joseph Leroy IRWIN, Sr., and Ruby Ann Clanton, Respondents-Appellees.

In re The ADOPTION OF Sandy Tristan KOIVU.

Court of Appeals of Tennessee, Eastern Section.

July 25, 1986.

Application for Permission to Appeal Denied by Supreme Court Sept. 29, 1986.

Roger L. Ridenour, Clinton, for petitioners-appellants.

Neil G. McBride, Oak Ridge, for respondents-appellees.

## OPINION

GODDARD, Judge.

This is an appeal by Ray A. Koivu and his wife Georgeanna, Petitioners-Appellants, from a consolidated suit, seeking the termination of parental rights and the adoption of Joseph L. Irwin, Jr. (Sandy Tristin Koivu), age 7, the natural son of Joseph L. Irwin, Sr., and his wife, Ruby, Respondents-Appellees. The other suit with which this was consolidated involved a Mr. and Mrs. John L. Gann and the termination of parental rights and the adoption of Mary Irwin (Karen Renee Gann), age 5, another child of the Irwins.

In the Chancery Court both the Koivus and the Ganns attempted to prove that the Irwins had abandoned the two children, and that it was therefore proper to proceed with their adoption. The Chancellor found that there had been no abandonment on the part of the Irwins, or that if there had, there had been repentance, but ordered that custody of the children remain with the Koivus and the Ganns. The Koivus are the only parties appealing the decision of the Chancellor.

Although the Ganns are not appealing the Chancellor's decision, we feel it is important to state here that they were and are very important and instrumental throughout this determination. As will be shown later, it would be virtually impossible to decide this appeal without repeated references to them.

The pertinent facts will be addressed. In 1981 the Irwins and the children, having moved from Atlanta, Georgia, were living in Knoxville. There was evidence that the Irwins were then and continue to be of

very limited means and resources, although their present position is improved. In October of 1981, a relative and temporary guest at the Gann home in Anderson County, Linda Phillips, happened to meet Ruby Irwin at a blood bank in Knoxville. Ruby was accompanied by her daughter, Mary, an infant at that time. At this initial meeting Ruby allowed Phillips, a stranger to Ruby, to take Mary home with her. There was evidence that Mary was sick, in that she had a fever and a cold.

The child was returned to Ruby by Phillips and Mrs. Gann the next day. As a result of this initial contact, at various times, Ruby would leave Mary with the Ganns. The periods of time the Ganns would keep Mary would be from a few days to, on one instance, more than a month. Also, the Ganns would visit the Irwin home and bring necessaries, such as diapers and milk, to the child.

In June of 1982, Ruby and the children returned to Atlanta, where they moved in with Ruby's mother and step-father. At this time, Joseph, Sr., had been convicted of a crime and was serving his sentence through a work release program at a penal farm in Knox County. There was continued contact between Ruby and the Ganns.

On October 22, 1982, Ruby and the children were "kicked out" of the house. Ruby was destitute and sought shelter at a downtown Atlanta mission. She also contacted the Department of Human Services in Atlanta.

Although the record is not clear who contacted whom, the Ganns were informed of the eviction also. Through this contact and others, Ruby asked the Ganns to come to Atlanta and take both Mary and Joseph, Jr., back to Tennessee. The Ganns agreed to take Mary but not both children. Ruby refused any arrangement where both children would not be taken. Within a short period thereafter, it was decided that the Ganns would take Mary and the Koivus, a couple who also lived in Anderson County, who were referred to the Ganns by a Sally Ticker, would take Joseph, Jr. Ruby never met either of the Koivus before this time.

On October 25, 1982, the Ganns, the Koivus and various relatives traveled to Atlanta to receive the children. After some confusion as to where the travelers were to meet Ruby and the children, contact was made at the Department of Human Services office. Documents were executed at that time and at the Probate Court for Fulton County, one being a statement allowing the children to leave Fulton County, Georgia, and relocate in Anderson County, another consenting to medical care for the children and a third entitling "Relinquishment of Parental Rights," signed by Ruby and duly notarized by the Probate Clerk.[1]

Upon the return of the Ganns and the Koivus from Atlanta, Mr. Gann and Mr. Koivu went to the Knox County penal farm where Joseph, Sr., was serving his sentence, and told him of the events regarding his children. Mr. Gann and Mr. Koivu discussed with Joseph, Sr., the possibility of executing documents having the same effect as those signed by Ruby, but he declined. The evidence showed, however, that Joseph, Sr., was thankful that the Ganns and the Koivus were caring for the children instead of their mother.

After the children were brought to Tennessee, the only personal contacts had by Ruby with the children were through collect phone calls to the Ganns. Ruby never called the Koivus although she knew their name and the county in which they lived. The Koivus were the only such name in the phone directory of Anderson County. Ruby's last phone call to the Ganns was on December 7, 1982, which was Mary's second birthday. The Ganns changed their phone number sometime after January due to an unrelated situation involving the adoption of another child. The last contact that Joseph, Sr., had with either the Ganns

---

1. In the lower Court there was some question as to the legal efficacy of these documents and whether Ruby understood their import. The Chancellor found that they had no legal effect, although he seemed to find that the documents were some indicia of the parties' intentions at the time the children were received.

or Koivus was also on December 7 by a phone call to the Ganns.

Joseph, Sr., was released from the work release program in November of 1982, and after a short time in Clarksville, Tennessee, he returned to Atlanta. Ruby remained in Atlanta during this time, and requested the assistance of the Department of Human Services for the return of the children. The Koivus filed the petition to terminate the parental rights of Ruby and Joseph, Sr., as to Joseph, Jr., on August 2, 1983.

The Chancellor, after hearing all the evidence and reviewing all exhibits, found in pertinent part:

COURT: Gentlemen, the Court's had an opportunity for the last day and a half to observe the witnesses, both on the stand and in the courtroom, to make certain determinations concerning the credibility of the witnesses. The Court has read all of the exhibits that have been introduced, together with the confidential report filed by the Department of Human Services. The Court would find that on October 25th, 1982 no surrender was executed nor was any guardianship effected in the state of Georgia. The Court would further find that on October 25th, 1982 in the state of Georgia it was the intent of Mrs. Irwin to abandon her children to Mr. and Mrs. Gann and Mr. and Mrs. Koivu. The Court would find that there is evidence of her repentance of that abandonment commencing in January of '83, consisting of statements of social workers. The Court would find that on October 5th [25th], '82 Mr. Irwin was confined by the penal authorities of this state, or was in a work release program; that he has not at any time consented to any adoption or consented to abandonment. The Court would find that he did not for an extended period of time, certainly more than 4 months preceding the filing of this action, make or tender any contribution toward the support of these children. The Court would find that based on his testimony he would have been able to make some tender and make some support to the

children during that period of time. The contact by the parents, Mr. and Mrs. Irwin, with the Ganns, or primarily the Ganns, terminated in December 1982, that these contacts were always at the expense of the Ganns, that is, collect telephone calls. The Court would find that Mrs. Gann did not receive any letters from Mrs. Irwin. The Court feels and the Court is considering the intellectual and financial abilities of the Irwins. The Court would find that they did not make reasonable efforts to establish contact with the children. They knew they lived in Anderson County, Tennessee. They had the Ganns' address during this period of time. The telephone number was not changed, as evidenced by the exhibit, until sometime after January of '83 in that the exhibit reflects the same telephone number on the billing through the end of December. They could easily in the opinion of the Court have established contact with the Ganns and, in fact, could have established contact with the Koivus had they wished to do so. But they limited themselves to making requests of a public service agency in the state of Georgia during that period of time to find the children and get them back for them. The evidence indicating lack of abandonment is confined after December of 1982 to those requests to a public service agency in the state of Georgia up through and until and following the filing of these petitions herein. Based on the law as I understand it concerning abandonment—The Court would further find, by the way, that neither of the Irwins have made any attempt to send gifts on birthdays or have any contact on birthdays, send Christmas gifts, or have any contact at Christmas time with the children, have not tendered any support in any form or any nature whatsoever for these children from and after October 25th, 1982. Based on the law as the Court understands it—And this one time I'm going to say: hopefully the Court is in error in this matter; based on the law as the Court understands it the Court cannot

declare an abandonment in this case, that it's occurred.

The issue stated by the Koivus is whether the Court erred in finding that there was no abandonment, where the Court did find (1) an intent to abandon the child Joseph, Jr., (2) a failure of the Irwins to contact the child or the Koivus, and (3) no attempt to tender support for the child during the time between the giving of the child to the Koivus and the filing of the termination petition.

■ Abandonment, as it pertains to an adoption proceeding,[2] is defined in this state as any conduct on the part of the parent which evinces a settled purpose to forego all parental duties and relinquish all parental claims to the child. *Ex parte Wolfenden*, 49 Tenn.App. 1, 349 S.W.2d 713 (1959). Evidence of an abandonment must be clear and convincing. The evidence must clearly show a conscious disregard or indifference to the parental obligations for a court to forfeit the parental rights and obligations. *Fancher v. Mann*, 58 Tenn. App. 471, 432 S.W.2d 63 (1968). To determine an abandonment the court is not to look at the protestations of affections and intentions expressed by the natural parents, but look at the past course of conduct. *Id.* Non-exclusive factors that prior case law reveals include, as to those situations where the child is removed from the parent, the amount of support given to the child, the degree of contacts and visits with the child and whether gifts were sent on special days. Also, there are considerations of whether the child was voluntarily removed to another person and whether such a removal was acquiesced in. The length of time the child is away from the natural parent during the period at issue is also a factor. Also, the condition of the home environment and the conduct of a parent toward the child prior to or in lieu of any actual removal of the child to another is a factor in the determination of an abandonment.

■ The ultimate question in an abandonment situation is whether there is clear and convincing evidence of an overall lack of any parental responsibility. A finding of a possible abandonment, or the lack of such a finding, on the part of one parent is not to be interpreted as conclusive to the other parent or the ultimate issue.

■ As to the father, Joseph, Sr., the facts clearly show that he abandoned Joseph, Jr. Joseph, Sr., knew of the transfer of the children to Anderson County, and he knew the names of the Ganns and the Koivus as the families who received the children. He acquiesced in the placement and was thankful that it had occurred. He provided no support, contacts or gifts to the boy (or the girl) throughout the entire period in question. Aside from the phone call to the Ganns in December of 1982, Joseph, Sr., simply did nothing that would indicate the exercise of parental rights or the incurrence of parental responsibilities.

■ As to the mother, Ruby, the same conduct applies, except that in her case, she made more collect calls to the Ganns, and she contacted the Department of Human Services, who had a history profile as to both Ruby and Joseph, Sr., and requested the Service to get her children back. In evaluating the conduct of Ruby at the time of and after the giving of Joseph, Jr., to the Koivus, we must go back to before the Ganns and the Koivus received the children, to evaluate her parental practice. Looking at the overall picture, we see that Ruby (and Joseph, Sr., for that matter) was totally inadequate so far as parental skills were concerned. The Chancellor so found, and we will not go into details. Confining our analysis to the abandonment, we see that Ruby, whether in times of need or not, relying on the generosity and compassion of the Ganns, would send for them to re-

---

**2.** There is a distinction in the law between those cases where an abandonment is asked to be declared and those cases where not only is there an abandonment request, but also an adoption of the abandoned child. In the former situation, there is a statutory definition of abandonment, contained in T.C.A. 36–1–102(1)(A), while in the latter case law sets out the definition. *Ex parte Wolfenden*, post.

ceive and care for Mary many times. The Ganns took it upon themselves to provide Mary with proper nourishment and hygiene with no support from Ruby. We do not know where Joseph, Jr., was during these times, but as stated earlier, it is the comprehensive conduct of the parent toward the offspring that is under evaluation here. The giving of the children to the Ganns and the Koivus in Atlanta is also representative of her indifference to her parental obligations. We sympathize with her dire situation at that time, and we recognize that according to *Pierce v. Bechtold,* 60 Tenn. App. 478, 448 S.W.2d 425 (1969), a case dealing with a child left with a relative, there is an argument to be made that in such a distressful situation, an abandonment may not be considered voluntary, but we feel that Ruby's overall attitudes and actions regarding these children indicate a pattern of indifference toward them. When times were not so good, Ruby would merely place the responsibility for the children with someone else, and then retrieve them when all was better. This act of giving the children away to others, as in this case to strangers, when times are bad, and retrieving them when times are good, may be in the children's best interests, but there comes a point, as was reached in this case, where expectations and home stability become an issue, and become more of a detriment to the children than a benefit. As is stated, along analogous lines, in *Derryberry v. Martin,* 686 S.W.2d 94, 97 (Tenn.App.1984):

> Parenthood is not made of such flexible fabric. No parent has the right to abandon all responsibility, yet insist that the child be fed, housed, clothed, and nurtured by others but remain available to be claimed as an offspring to be visited at the whim of a derelict parent who would thereby deny the child the security and stable environment of an adoption.

We do not feel that the efforts of Ruby in contacting and requesting the Department of Human Services to retrieve her children for her constitute a repentance of her abandonment. This act was merely a different procedure than what she had used in the past, possibly due to the greater distance, and was consistent with her pattern of irresponsibility. All in all, we are not looking to the intention of Ruby as the Chancellor did at the time she gives her children to others, but only to the fact that it is done. Her pattern of releasing and retrieving her offspring, whether due to need or not, evinces at each instance a settled purpose to forego all parental rights and relinquish all claims to the children. Repentance of such abandonment in essence does not occur, for as her pattern of conduct illustrates, the next time she may have a need or desire to remove herself from her children, she will call upon others again.

Moreover, even in cases where a parent has re-established contact with a previously abandoned child, the Court may decline to find the abandonment has been terminated. In addressing this question Mr. Justice Brock, speaking for the Court in *Adoption of Bowling v. Bowling,* 631 S.W.2d 386 (Tenn.1982), and quoting from *Wolfenden,* which in turn quotes from American Jurisprudence, said the following (at page 389):

> "So, the issue of abandonment should be resolved by the Circuit Court under the following statement of the law:
>
>> 'Abandonment imports any conduct on the part of the parent which evinces a settled purpose to forego all parental duties and relinquish all parental claims to the child. It does not follow that the purpose may not be repented of, and, in proper cases all parental rights again acquired.... But when abandonment is shown to have existed, it becomes a judicial question whether it really has been terminated, or can be, consistently with the welfare of the child.' 1 Am.Jur., Adoption of Children, § 42." 349 S.W.2d at 714.

The Supreme Court of Pennsylvania dealt with a question similar to the one at bar. In *In Re Adoption of Battle,* 456 Pa. 553, 321 A.2d 622 (1974), the father of an illegitimate daughter, born in 1960, obtained custody of her with the consent of the mother. At the time he obtained custody she was living with her mentally-defi-

cient grandmother in North Carolina, and was seriously ill. He, with the aid of his wife and others, nursed her back to good health and retained custody for approximately six years.

The mother made short visits with her daughter and in 1967, without the knowledge and consent of the father, removed the child from Pennsylvania to North Carolina and thence to New York. The child remained in her mother's custody until February 1970, when she was sent back to the father. She remained with her father for about two months when her mother again took custody of the child and took her back to New York. In September 1970 she was again returned to the custody of her father.

In rejecting the mother's claim that the adoption by the father and his wife should not be granted, the Court stated the following (at page 624):

> We also dismiss Laura Battle's claim that her custody of Elisa for nearly two years immediately prior to the institution of this action terminated her earlier abandonment. She contends that abandonment cannot exist during a period of the maintenance of the physical custody of the child. While we do not intimate that an abandonment is irrevocable, we will not allow a parent who has once shunned her parental duties to terminate that abandonment by merely obtaining custody of the child in the manner here employed. This court has stated that: "Abandonment is not an ambulatory thing," *Davies Adoption*, 353 Pa. 579, 587, 46 A.2d 252, 256 (1946), and that "once the abandonment is shown to have existed, it becomes a judicial question whether it really has been terminated or can be, consistently with the welfare of the child," *Weinbach's Appeal*, 316 Pa. 333, 339, 175 A. 500, 502 (1934). Although an abandoning parent's later custody of the child is a factor to consider, once an abandonment has been established it is the child's welfare that is material. After thorough examination of the record, we are convinced that Laura

Battle's abandonment has not been terminated and we believe that Elisa's welfare would best be served by affirming the adoption decree.

Conceding for the purpose of argument that both Mr. and Mrs. Irwin had repented of their abandonment, we agree with the Supreme Court of Pennsylvania that once an abandonment has been established, it is the child's welfare that is material. In the present case the evidence is overwhelming that the best interest of the child would be served by being adopted by the Koivus.

We accordingly reverse the Trial Court and remand the cause for entry of a decree of adoption. The costs of appeal are adjudged against the Irwins.

PARROTT, P.J., and FRANKS, J., concur.