In re the **ADOPTION OF Christopher Glenn PARSONS.**

**Comer Vernon WILSON and wife, Ruby Mae Wilson, Plaintiffs–Appellees,**

v.

**Tracey PARSONS and Phillip Parsons, Defendants–Appellants.**

Court of Appeals of Tennessee, Middle Section, at Nashville.

Dec. 7, 1988.

Permission to Appeal Denied by Supreme Court Feb. 21, 1989.

Gary Williams, Hendersonville, for plaintiffs-appellees.

Phillip A. George, Gallatin, Bobby Davis, Madison, for defendants-appellants.

## OPINION

TODD, Presiding Judge.

One of the defendants, Tracey Parsons, has appealed from a judgment finalizing the adoption of the captioned minor by the petitioners, Comer Vernon Wilson and wife, Ruby Mae Wilson. The child was born December 4, 1982.

Appellant presents two issues, of which the first is as follows:

Whether the trial court erred in its determination that the Appellant had abandoned her child so as to enable the Court to grant the adoption over the objection of the natural mother.

On March 25, 1987, the plaintiffs instituted this proceeding seeking to adopt the captioned child who was alleged to be the natural child of the defendants, Tracey and Phillip Parsons. The petition alleged that the child had been abandoned by the defendants. The defendants answered denying abandonment, and the Trial Judge held bifurcated hearings on abandonment and adoption.

On July 8, 1987, a hearing was held on the issue of abandonment; and, on January 13, 1988, the Trial Judge filed a memorandum opinion in which he found that both parents had abandoned the child. In respect to the abandonment by appellant, Tracey Parsons, the memorandum states:

... In February, 1985, Tracey Parsons was looking for someone to take Christopher and take care of him.... Comer Wilson was visiting relatives, and Tracey was present and still looking for someone to take and care for Christopher. Comer Wilson called his wife, Ruby, sister of Charles Miles, and asked if she would accept Christopher; she immediately agreed and on the 21st day of February, 1985, Tracey Christine Parsons filed a petition in the Juvenile Court of Sumner County, Tennessee alleging Christopher Glenn Parsons to be dependent and neglected and that she, the mother, had no permanent residence and was unable to care or provide for the child and that the whereabouts of the father, Phillip Glenn Parsons, was unknown. Ruby and Comer Wilson joined in the petition. Temporary custody of Christopher Glenn Parsons was placed with Comer and Ruby Wilson by the Juvenile Court of Sumner County, Tennessee.

Within a week of taking temporary custody of Christopher, Ruby and Comer Wilson observed that Christopher did not respond to voice or other sound. Ruby took the child to the Public Health Department in Sumner County, Tennessee and the department set up an appointment in Nashville at the Crippled Children's Hospital according to Ruby Wil-

son's testimony. Ruby Wilson contacted Tracey Parsons, and Tracey consented to go with Ruby to take Christopher for testing in Nashville. Christopher was diagnosed as being hearing impaired. The Crippled Children's Hospital referred Christopher to the Bill Wilkerson Hearing and Speech Center, but Tracey did not go. Ruby Wilson and her sister-in-law took Christopher, and it was confirmed that Christopher was hearing impaired, and at that time Ruby Wilson was informed by professional staff at Bill Wilkerson Hearing and Speech Center that sign language would have to be taught to Christopher and that adults caring for Christopher would have to learn sign language and that the adults would have to attend classes. Ruby Wilson told Tracey Parsons of the information obtained from the evaluation at Bill Wilkerson Hearing and Speech Center and of the sign language and of the need to attend classes to learn sign language. Classes were begun in the Wilson home. Tracey Parsons knew of the classes but did not attend; Tracey did sit in on a portion of one class.

Tracey Parsons has not learned sign language for communication with Christopher. Three weeks before this hearing she signed up for a sign language class in Nashville.

Tracey Parsons testified that she never suspected that Christopher was hearing impaired. She testified that she never hit Christopher in the head. Tracey Parson's testimony is contradicted by Connie Keith, Melissa Craddock and Mark Craddock. Connie Keith testified that prior to custody being placed with the Wilsons Christopher cried a lot and Tracey gave valium to Christopher. Connie Keith testified that she was present on one occasion when Tracey took a valium, cut it in half and gave it to Christopher and that she (Connie Keith) told Tracey "You are going to kill the baby." According to Connie Keith everybody, including Tracey, knew the baby couldn't hear but that Tracey said, "He is just hardheaded".

Melissa Craddock testified that Christopher cried a lot and that Tracey screamed at him, cursed him, and hit him in the head. "We clapped in his ears and hollered in his ears and Tracey was there and this was before the Wilsons got custody", testified Melissa Craddock.

... According to Mark Craddock, Christopher couldn't hear anything and a lot of people mentioned to Tracey that Christopher couldn't hear. "I said to Tracey, he can't hear and needs to go to the doctor and Tracey said he is just hardheaded", testified Mark Craddock.

The Court finds the credibility of Tracey Christine Parsons to be lacking. She did hit the child in the head, and she should have suspected the hearing problems of the child. Tracey Parsons testified that she had a birthday party for Christopher in 1986. She did not. The party was in 1985. Charles Miles, the maternal grandfather, contradicted the testimony of Tracey Parsons about the birthday. The pictures (Exhibit 5) entered by Tracey Parsons as being for Christopher's birthday 1986 were taken at the birthday party in 1985. The grandfather testified that in 1986 that he took Christopher to Kroger's and let him (Christopher) pick out his birthday cake. Tracey Parsons did not provide gifts or visit on Christopher's birthday, 1986. She did in 1985.

Charles Miles testified that he had Christopher from birth till Ruby got him.

After the Wilsons took temporary custody of Christopher, Tracey Parsons could visit at any time. She did not visit him on a regular basis but would drop by. At times, by her testimony, she went more than a month without visiting Christopher. Ruby Wilson testified that Tracey Parsons went as long as three months without seeing Christopher. Tracey Parsons has paid no support for the care of Christopher since the Wilsons have had custody. Tracey Parsons testified, "It is true that I have not financially supported Christopher; he is getting income of $340.00 a month and that is adequate to provide for him. He gets

Medicaid and they have never asked for money".

Tracey Parsons testified that she told Ruby Wilson, "I'll let Christopher stay with you if I can have weekends and you promise never to adopt him or change his name." Ruby Wilson on rebuttal denied that Tracey had mentioned adoption.

The Sumner County Board of Education provides a public school program for hearing impaired and at the time of this hearing Christopher was in the second year of the program at Howard School in Gallatin. Tracey Parsons has never visited the school nor talked with Christopher's teacher. Ann Sitton, self employed audiologist, testified that she first saw Christopher on March 29, 1985 at Bill Wilkerson Hearing and Speech Center; that when she saw Christopher for the first time that he was over two years of age and had no speech and was unable to communicate; that he had a significant hearing loss; that she now sees Christopher every three months and that he is enrolled in the special education program in Gallatin; that she has never met the natural mother, Tracey Parsons, and Tracey Parsons has never made any contact with her and that Tracey Parsons would never been excluded by her.

. . . .

... Tracey Christine Parsons has manifestly displayed an indifference to the needs of her child. She has never financially supported the child, and she only finds a residence which might be considered permanent approximately a month before this hearing. Prior residences have been with her mother, father, aunt, boyfriend and friends. Even now the residence she has is one shared with her father. Tracey Parson's conduct evinces clear and convincing evidence to this court that she willingly foregoes all parental duties and relinquishes parental claims to the child. From the birth of the child until this hearing she has been content to let others feed, clothe, provide housing and education for the child. In her testimony she objects to the child being adopted

and said, "No, I don't consent to adoption" but she testified that she told her aunt, Ruby Wilson, that Christopher could stay with her (Ruby Wilson) "if I can have weekends".

The Court finds that by clear and convincing evidence that Tracey Christine Parsons has abandoned her child.

. . . .

This Court terminates the parental rights and responsibilities of Tracey Christine Parsons as to her son, Christopher Glenn Parsons.

Appellant's brief contains a 14 page statement of facts, 11 pages of which contains not a single citation to the record. The remaining pages contain 7 citations to the record all of which are irrelevant to the first issue.

The argument of appellant contains citations supporting the following facts:

1. Ruby Wilson is appellant's aunt.

2. Appellant was 15 years old and separated from her husband when the child was born.

3. She has never been self-sufficient and had always relied upon the assistance of others for the care of her child.

4. Appellant visited her son on a sporadic basis during the period appellees had the child in their home.

5. She admitted going as long as a month between visits.

6. The Trial Judge found that these visits were at her convenience, but he made no finding as to the number of visits.

7. "Tracey testified that she did not visit more frequently for two reasons: first, because the Wilsons insisted that her visitation be restricted to their home after she failed to return the child to their home in a timely manner on one of the three occasions they did allow her to take Christopher away from their home (R. 50, 61). Second, Tracey testified that Mr. Wilson would touch her on the leg and back in a manner which she did not approve and which made her feel very uncomfortable (R. 50). Mr. Wilson admitted that he had touched Tra-

cey but only wanted to make her 'feel welcome' (Tr. 50)."

8. During the time that Christopher resided with the Wilsons, appellant purchased Christmas and birthday cards for her son as well as gifts and clothing.

9. Mrs. Wilson admitted that the sudden interest of the father in the child was a factor in the decision to adopt, that, prior to the effort of the father to obtain the child, appellant was allowed to see the child, but that thereafter visitation was by court order only.

10. Appellant unsuccessfully attempted to regain custody in 1986.

Appellant argues that the evidence does not support a finding of abandonment.

In *Ex Parte Wolfenden*, 49 Tenn. App. 1, 349 S.W.2d 713 (1959), this Court remanded for a further hearing on the issue of whether the natural father of the child had abandoned the child by delivering it into the custody of an aunt and uncle, and said:

(2) We should like to point out that in resolving the issue of abandonment, the circuit judge is not limited by the definition of an abandoned child found in Section 36–102(5):

"For the purpose of this chapter, an abandoned child shall be any child under the age of eighteen (18) years who shall be willfully abandoned at least four (4) consecutive months immediately preceding institution of an action or proceeding to declare the child to be abandoned child."

This definition applies according to its express provisions only in case there is an "action or proceeding to declare the child to be abandoned child," and has not been extended by amendment or construction to apply when the issue of abandonment is under consideration in an adoption proceeding in the circuit or chancery court.

(3) Under the opinion of the Supreme Court in *Young v. Smith* et al., 191 Tenn. 25, 231 S.W.(2d) 365 [ (1960) ], it is our duty to construe the adoption law generally so as to achieve a primary result: the adoption of children under circumstances and conditions most likely to be for their best welfare. The adoption law would be largely nullified, if we were to construe Section 36–102(5), T.C.A. as placing it within the power of a disappointed parent to avoid the effect of an actual abandonment by any conduct inconsistent with that actual abandonment engaged in within four months of the time of the commencement of the adoption proceedings. So, the issue of abandonment should be resolved by the Circuit Court under the following statement of the law:

"Abandonment imports any conduct on the part of the parent which evinces a settled purpose to forego all parental duties and relinquish all parental claims to the child. It does not follow that the purpose may not be repented of, and, in proper cases all parental rights again acquired.... but when abandonment is shown to have existed, it becomes a judicial question whether it really has been terminated, or can be, consistently with the welfare of the child." 1 Am.Jur. Adoption of Children, Section 42.

49 Tenn.App. at 4, 5, 349 S.W.2d 713.

In *Koivu v. Irwin*, Tenn.App. 1983, 721 S.W.2d 803, the Trial Judge ruled that there has been no abandonment, or, if there had been an abandonment, there had been a repentance. This Court reversed and said:

(1, 2) Abandonment, as it pertains to an adoption proceeding, is defined in this state as any conduct on the part of the parent which evinces a settled purpose to forego all parental duties and relinquish all parental claims to the child. *Ex parte Wolfenden*, 49 Tenn.App. 1, 349 S.W.2d 713 (1959). Evidence of an abandonment must be clear and convincing. The evidence must clearly show a conscious disregard or indifference to the parental obligations for a court to forfeit the parental rights and obligations. *Fancher v. Mann*, 58 Tenn.App. 471, 432 S.W.2d 63 (1968). To determine an abandonment the court is not to look at the protesta-

tions of affections and intentions expressed by the natural parents, but look at the past course of conduct. Id. Nonexclusive factors that prior case law reveals include, as to those situations where the child is removed from the parent, the amount of support given to the child, the degree of contacts and visits with the child and whether gifts were sent on special days. Also, there are considerations of whether the child was voluntarily removed to another person and whether such a removal was acquiesced in. The length of time the child is away from the natural parent during the period at issue is also a factor. Also, the condition of the home environment and the conduct of a parent toward the child prior to or in lieu of any actual removal of the child to another is a factor in the determination of an abandonment.

(3) The ultimate question in an abandonment situation is whether there is clear and convincing evidence of an overall lack of any parental responsibility....

... This act of giving the children away to others, as in this case to strangers, when times are bad, and retrieving them when times are good, may be in the children's best interests, but there comes a point, as was reached in this case, where expectations and home stability become an issue, and become more of a detriment to the children than a benefit. As is stated, along analogous lines, in *Derryberry v. Martin*, 686 S.W.2d 94, 97 (Tenn.App.1984):

> Parenthood is not made of such flexible fabric. No parent has the right to abandon all responsibility, yet insist that the child be fed, housed, clothed, and nurtured by others but remain available to be claimed as an offspring to be visited at the whim of a derelict parent who would thereby deny the child the security and stable environment of an adoption.

. . . .

Moreover, even in cases where a parent has re-established contact with a previously abandoned child, the Court may decline to find the abandonment has been terminated. In addressing this question Mr. Justice Brock, speaking for the Court in *Adoption of Bowling v. Bowling*, 631 S.W.2d 386 (Tenn.1982), and quoting from *Wolfenden*, which in turn quotes from American Jurisprudence, said the following (at page 389):

> "So, the issue of abandonment should be resolved by the Circuit Court under the following statement of law:
>
> 'Abandonment imports any conduct on the part of the parent which evinces a settled purpose to forego all parental duties and relinquish all parental claims to the child. It does not follow that the purpose may not be repented of, and, in proper cases all parental rights again acquired.... But when abandonment is shown to have existed, it becomes a judicial question whether it really has been terminated, or can be, consistently with the welfare of the child.' 1 Am.Jur., Adoption of Children, § 42." 349 S.W.2d at 714.

. . . .

(7) Conceding for the purpose of argument that both Mr. and Mrs. Irwin had repented of their abandonment, we agree with the Supreme Court of Pennsylvania that once an abandonment has been established, it is the child's welfare that is material. In the present case the evidence is overwhelming that the best interest of the child would be served by being adopted by the Koivus.

We accordingly reverse the Trial Court and remand the cause for entry of a decree of adoption....

721 S.W.2d at 807–809.

In *Bowling v. Bowling*, Tenn.1982, 631 S.W.2d 386, the Trial Court and Court of Appeals approved adoption by maternal grandparents over the objection of the natural father and paternal grandparents. The Supreme Court affirmed, citing *Wolfenden*, and said:

> We affirm both the Chancellor's finding of facts and his conclusion that they demonstrated abandonment by the father of the subject child. *Accord: Loar Adoption*, 56 Pa.D. & C.2d 618 (1972); *Hamby v. Hamby*, 264 S.C. 614, 216 S.E.

2d 536 (1975); *In Re Adoption of Dobbs,* 12 Wash.App. 676, 531 P.2d 303 (1975); *Hutson v. Haggard,* Texas Civ.App., 475 S.W.2d 330 (1971). For cases dealing with this general subject matter see annotations at 78 A.L.R.3d 712, 79 A.L.R.3d 417.

631 S.W.2d at 390.

In *Fancher v. Mann,* 58 Tenn.App. 471, 432 S.W.2d 63 (1968), this Court held that evidence was insufficient to find abandonment by a father where the parents had been divorced a number of years; the father had given them presents on their birthdays and at Christmas and had visited them as often as his work and orders of the divorce case permitted. This Court summarized as follows:

(5) Even taking into consideration the limitations of the divorce decree and the attitude of the mother, we do not think Mr. Mann has shown the usual and proper concern for his children a parent should. Nevertheless, after a careful study of all the proof, we cannot say the evidence here is so clear, convincing and unequivocal to show that Mr. Mann "evinces a settled purpose to forego all parental duties and relinquish all parental claims to the child(ren)." ...

58 Tenn.App. at 479, 432 S.W.2d 63.

In *Pierce v. Bechtold,* 60 Tenn.App. 478, 448 S.W.2d 425 (1969), this Court reversed a finding of abandonment where relatives cared for the child at the request of the mother because of her inability to do so while working to support herself and another child. The mother's offer to pay for the child's keep was refused, and she visited the child at regular intervals from a distant city. She was in the act of transporting the child to the distant city when she was interrupted by a court order.

The evidence in the present case discloses an utterly irresponsible parent whose acts have amounted to an abandonment. Even if her belated efforts could be interpreted as a repentance, the circumstances are such that it would not be for the best interest of this child to take him from the custody of the plaintiffs who have contributed and will continue to contribute so admirably to his rehabilitation, and to restore him to a mother who has done little to him in the past except to neglect, abuse and abandon.

The evidence does not preponderate against the finding of abandonment and is sufficient as a matter of law to justify such conclusion of the Trial Court.

No merit is found in appellant's first issue.

Appellant's second issue is:

Whether the Court erred in its determination that it was in the best interests of the minor child to grant the Appellees' Petition for Adoption.

Appellant insists that the decision of the Trial Court to allow the adoption is "not supported by the evidence."

The evidence shows that the plaintiffs have cared for the child as parents for nearly four years, that he calls the plaintiffs "mama" and "daddy", that plaintiffs have discovered the child's hearing handicap, have had it diagnosed and treated, and have prepared themselves by training to communicate with the child. There is every indication that they have been and will continue to be the kind of parents this child needs.

It would be the height of injustice and the depth of tragedy to deprive this child of the happy and beneficial environment which plaintiffs have provided and will provide for him.

No merit is found in appellant's second issue.

The judgment of the Trial Court is affirmed. Costs of this appeal are taxed against appellant. The cause is remanded to the Trial Court for such further proceedings, if any, as may be necessary and proper.

AFFIRMED AND REMANDED.

LEWIS and CANTRELL, JJ., concur.