IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
January 6, 2003 Session

## DEPARTMENT OF CHILDREN'S SERVICES v.
## C. L. & M. T.

**Appeal from the Juvenile Court for Davidson County**
**No. 9919-47933      Andrei E. Lee, Special Judge**

_____

**No. M2001-02729-COA-R3-JV - Filed August 29, 2003**

_____

At issue in this appeal is the petition filed by the Department of Children's Services to terminate the parental rights of Mother and Father to nine of their children. After a trial, the trial court granted the petition to terminate the parental rights of Mother and Father based on abandonment, failure to comply with the Permanency Plans, and persistence of the conditions which led to the removal. Each parent independently appeals the decision of the trial court, arguing that there was not clear and convincing evidence to support the trial court's ruling. Because we find that grounds for termination were not proved as to either parent, we reverse the judgment terminating Father's and Mother's parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Reversed and Remanded**

PATRICIA J. COTTRELL, J., delivered the opinion of the court, in which BEN H. CANTRELL, P.J., M.S., and STELLA L. HARGROVE, SP. J., joined.

J. Stephen Mills, C. Michael Cardwell, Nashville, Tennessee, for the appellant, M. T.

Bruce Balcom, Nashville, TN, for the appellant, C. L.

Paul G. Summers, Attorney General and Reporter; Elizabeth C. Driver, Assistant Attorney General, for the appellee, State of Tennessee, Department of Children's Services, et al.

**OPINION**

Although they never married, C. L. ("Mother") and M. T. ("Father") had a long-term relationship that resulted in the birth of ten children. This appeal involves an action brought by the Department of Children's Services ("DCS") to terminate the parental rights of both Mother and Father to nine of their children, all boys, born in August of 1989, February of 1991, May of 1992, January of 1994, April of 1995, November of 1996, February of 1998, February of 1999, and April of 2000.[1]

DCS first became involved with these children in November of 1998. At that time, seven children were living at home with Mother. Mother had another older son, then 11 years old, fathered by a different man, who was not living at home because he was in custody of DCS. A DCS worker visited Mother's home as part of an assessment related to this oldest child. While there, the worker observed that the youngest child, then nine months old, appeared very small for his age. The worker questioned Mother about the infant's health, birth, food, and medical care. The answers provided were later determined to be false. Mother was told to take the child to the doctor within a few days, but she failed to do so. The DCS worker and a nurse returned to Mother's home two days later, and the nurse found the infant to have below normal weight, height, and head circumference. DCS gave the mother a supply of infant formula and again told her to take the child to the doctor. On subsequent visits, DCS workers determined that Mother had not obtained formula for the child and continued to feed him "Kool-Aid" or a similar drink.

Consequently, DCS obtained an order from the Juvenile Court for an investigation and directing Mother to allow DCS access to her home or to the child. A subsequent medical examination may have revealed the child was suffering from failure to thrive due to poor nutrition.[2] A later petition filed by DCS stated that two of Mother's other children had been previously hospitalized for failure to thrive.

In March of 1999, DCS filed an Expedited Long-Term Petition for Adjudication of Dependency and Neglect and Request for Court Ordered Services, naming nine children. This list included Mother's oldest son who was already in DCS custody "because he was abandoned in detention by his mother."[3] Additionally, another child had been born in February of 1999, and this

---

[1] In cases of this type, this court generally uses initials to refer to the children and parents involved so as to protect the privacy of the children. That procedure proved impossible in this case because all nine of the children have the same initials. Consequently, we have tried to use generalized descriptions where it is necessary to discuss facts regarding a particular child. Although ten children were born to Mother and Father, only nine are involved in this case. Another child was born shortly after the trial of the termination proceedings involved herein.

[2] There is actually conflicting testimony regarding the exact diagnosis, and none from the doctor making it.

[3] According to the petition, Mother failed to pick up this eleven year old from detention after adjudication on his delinquency charge.

child was included in the petition. The petition alleged the facts set out above and also alleged that Mother had failed to properly feed, care for, and provide medical care for all the children.

In addition, the petition alleged that Mother had often left all the children at home in the charge of the 9 year old and the 8 year old; that on one of these occasions the 8 year old had suffered burns while trying to prepare dinner; that he was seen by the school nurse for these burns; and that Mother was told to take him to the doctor but failed to do so. The petition further alleged that Mother had obtained no prenatal care during her most recent pregnancy. In addition, DCS alleged it had offered numerous services to Mother, and she had declined them.

Based on these allegations and DCS's belief there were no relatives available for a safe placement, DCS asked that the court to award temporary legal custody to it "or appropriate relative or placement." The petition asked that Father be served and a hearing set to determine whether these children should be found dependent and neglected with temporary legal custody given to DCS and for an order that Mother be required to comply with all services offered by DCS if she retained physical custody.

Subsequently, an order was entered continuing Mother's custody of the children. The order reflects that a hearing was held May 10, 1999, and that Mother, her attorney, and Father were present, as well as the guardian ad litem. It also states that Mother had agreed to accept services in her home, that an identified agency had agreed to work with Mother, and that the Department was to provide a "Plan of Action" at the next court date.

Before the next court date, however, an incident occurred that prompted DCS to petition for custody and emergency removal of the children. On May 28, 1999, Mother went out during the day leaving seven children home alone.[4] Eventually, neighbors called the police department, and DCS was notified. When Mother showed up in the early hours of the next morning, she was immediately arrested for child neglect. DCS called Father, who, according to the petition, "responded within 10 minutes" of the initial call, even though he was at work. Father came to Mother's house and stayed with the children for several days. The petition states:

> [DCS] further received information that although [Father] had been staying in the home with the children over the weekend, that he was not to be in [Mother's] home due to the threat of her losing her housing. [Father], at this time, does not have adequate housing for all 8 children. The Department is unsure as to the stage he is at in the process of legitimation . . . .

With regard to Mother, DCS alleged she had violated the court's prior order that allowed her to retain custody, and that DCS could not trust her to supervise and care for her children.

---

[4]The youngest child was left with a friend of Mother's.

The court issued an emergency protective custody order and set a preliminary hearing on the matter four days later, on June 8, 1999. That hearing took place and was attended by Mother, Mother's attorney, Father, and the guardian ad litem as well as DCS employees and counsel. As a result of that hearing, the trial court declared Father the father of the eight boys, ordered their last name changed to his, and directed that a copy of the order be sent to the child support enforcement agency.

The court found there was probable cause to believe the children were dependent and neglected and no less drastic alternative to their placement in State custody was available, noting that Mother was at that time incarcerated on child neglect charges. The order also stated, "Reasonable efforts not possible because the parent [referring to Mother] failed to cooperate with [DCS] in addressing their issues." The court granted legal custody to DCS and set a date for a hearing on a plan of care. This order was entered July 15, 1999. Three days after the June 8 hearing, Father, without assistance of counsel, filed a petition seeking custody of the children.

Initial Permanency Plans[5] were completed for each of the children on July 1, 1999, each of which named the permanency goal as "return to parent." Given as the reason for custody was Mother's leaving the children alone without supervision or plans for the evening meal. Identified as conditions which contributed to state custody were the commitment to state custody of the older sibling "because of mother's inability to parent the child and because she failed to pick him up from detention. Mother has refused court ordered services in the home with the exception of HUGS. She has not taken advantage of the many programs and services offered to her by DCS."

Identified as parent or family strengths were Mother's ability to keep a neat household, the nearness of her residence to community resources, her health, and the fact that she "has the support of the biological father." With regard to several of the children, the Plan stated that the child wanted to return home to his mother and was well bonded with both Mother and Father. Plans for the other children noted the child's apparent strong bond to his parents and good relationship with his siblings.

Each Plan commented that Mother, as a single mother of eight children, needed support from the father both physically and financially, and noted that Father had worked with Mother with the agency that had provided some family services. The Plan also noted:

---

[5]A Permanency Plan is a written plan for a child placed in foster care. The plan sets out requirements for the achievement of a specific goal, such as reunification of the family, adoption, or permanent foster care. Tenn. Code Ann. §§ 37-2-402(8) & -403(a)(1). Tenn. Code Ann. § 37-2-403(a)(2)(A) mandates that the requirements of the Permanency Plan be stated in specific terms and be reasonably related to the specific goal. The Permanency Plans are to be reviewed within ninety (90) days of the date of foster care placement and no less often than every six (6) months thereafter, to assess compliance with the requirements and project a likely date on which the goal of the plan will be achieved. Tenn. Code Ann. § 37-2-404(b). In this case, several plans were presented to Mother and Father by DCS throughout the pendency of the proceedings.

The father has petitioned the court for custody of his children. He does not have suitable housing or minimal furnishings to care for the children. The father needs full time employment.

The steps Mother was required to take under the Plans included: (1) take parenting classes; (2) provide appropriate housing and furnishings;[6] (3) learn nutritional standards; (4) complete a psychological examination and follow recommendations for medication and counseling; (5) cooperate with Homemaker Services and learn purchasing and decision making skills; (6) obtain a GED and secure employment; (7) secure day care for the children;[7] (8) continue to work with the HUGS nurse; (9) participate in WIC; (10) secure medical treatment for the children, including immunizations; and (11) attend to her own physical health and receive treatment for anemia. The Permanency Plans set the responsibilities for Father as: (1) pay child support; (2) participate in raising his children; and (3) demonstrate his ability to hold a full time job and secure adequate housing and other essentials to raise his family.

Each Permanency Plan was signed by Mother and Father on July 1, 1999, and the court approved them on July 27, 1999. There was a hearing that day to review the plans, and the order indicates both Mother and Father were present, along with Mother's attorney and the guardian ad litem. The order recites that each parent stated he or she understood the obligations under the plan; that reasonable efforts were in progress; and that a change of custody was not in the children's best interests at that time. The court also established child support for both Mother and Father, and wage assignment notices were issued.

There was a hearing held on October 26, 1999, at which the Mother and her appointed counsel appeared, as did Father, again without counsel. The order resulting from the hearing indicates it was held on the pending petitions filed by DCS and on Father's petition for custody. The order, entered January 3, 2000, and entitled "Agreed Order of Adjudication and Disposition" states that the court "finds that the parties are in agreement and that there is clear and convincing evidence as to," followed by a recitation of the history of DCS's involvement with the family prior to removal of the children. In addition, this section includes a statement that Father had agreed to care for the children when Mother was arrested, "however he did not have adequate housing to care for the children on a long-term basis."

The order recites that the parties agreed and the court found that the children were dependent and neglected because their mother had failed to properly feed, care for and provide medical care for the children; that temporary custody should be awarded to DCS; and that Mother should pay child

---

[6]According to the Plan, Mother lost her housing during her incarceration after her arrest for child neglect.

[7]Specifically, this notation stated that Mother has been ordered to obtain her GED and secure employment. "Daycare must be provided for the children when the father is unable to stay with the children . . ." while Mother was working on these goals.

support. The court suspended Father's child support obligation, except for arrearages,[8] because Father "is actively working to regain custody of his children." This "Agreed Order" adjudicating the children dependent and neglected was not entered until August 25, 2000, some ten months later, and was signed only by the attorney for DCS, Mother's attorney, and the Guardian ad litem. Neither Father nor anyone purporting to represent him signed it.[9]

As previously ordered, the children's placement was reviewed by the trial court at a hearing on November 24, 1999. The order from that hearing states that reasonable efforts are in progress and that a change of custody was not in the children's best interests at that time. The order also includes a finding that the parents had not paid child support as ordered and that subsequent orders would be entered addressing the arrearage.[10] In addition, the court indicated it would appoint an attorney for Father. This order was entered March 23, 2000. Father was appointed an attorney by an order dated November 30, 1999.

New or revised Permanency Plans were prepared by DCS and signed by the parents at a staffing on December 10, 1999. The goal of each remained return of the child to the parent. Under family or parent strengths, each plan stated:

> Father demonstrates the depth of his relationship with the children by being concerned with their education and behavior when informed of issues surrounding these. Father has acquired housing with almost all the proper furnishings required to provide a home for he and the boys. Father is a hard worker and is maintaining a steady job. Father is in good physical health.

In addition, on each of the Plans involving a child in school Father was listed as having the responsibility to be sure the parents were involved actively in the child's education, to attend conferences, and to ensure that the child had appropriate time, place, and resources to do homework. At this time, the children had been placed in several different foster homes, some of which were in other counties. We must presume most of this requirement was directed to the situation that would occur after a family reunification.

The Plans further noted that because Father had not been the primary caretaker for the children, he needed a parenting assessment and to follow all recommendations from this assessment, including parenting classes. Mother was also required to have a parenting assessment and to acquire housing to accommodate "however many children she plans to have returned to her." Mother was

---

[8] There is no reference to the amount of these arrearages.

[9] On this basis and because he was not appointed an attorney prior to the dependency and neglect finding, Father challenges the validity of this order. The record before us does not include a transcript of the hearing that resulted in this order. Because of our disposition of the petition to terminate parental rights, we need not address this issue.

[10] Our review of the record revealed no arrearage orders.

also required to acquire and demonstrate the skills necessary for providing nutritious food to her children.

The Plans noted that Mother and Father were unsure of their future plans as a couple and did not have a common goal or plan on how to jointly parent. The Plans recommended couples counseling "as a way to work through issues surrounding how these two parents can parent their children while living in two separate households and the children only residing with one parent." Some of the plans identified special needs of specific children for educational, behavioral, or emotional problems and recommended services for those needs. The parents were not responsible for arranging those services.

The revised Plans were reviewed at a hearing on January 3, 2000, and the court approved the plans and stated, "The Court wants to make sure that this transition goes smoothly and that the children's needs are being addressed." We note the Plans referred to services that would be needed to transition the children from foster care back into the home of a parent. The court ordered that custody remain with DCS and ordered DCS to set up visitation.[11] The order also "terminated" Father's current support obligation, but ordered that payment on the arrearages continue. Father attended the hearing as did his attorney who had been appointed a month earlier. The order from this hearing was entered April 13, 2000.

At the January hearing, the court apparently ordered, and the parties agreed, that Father be given unsupervised weekend visitation with his three older children. Those visitations began, and several took place. However, in February of 2000, DCS filed a petition for contempt against both parents alleging that Father allowed Mother to be left alone with the children during a weekend unsupervised visit on February 12. That petition stated that at the January hearing the Department had expressed concern that Father might leave the children with Mother while he was working and DCS was uncomfortable with that because Mother had made little progress on her Permanency Plan responsibilities. The petition further alleged that the court had ordered weekend visitation for Father and allowed Mother to visit the children at Father's home on those weekends only as long as there was a neutral third party present, and that both parents agreed to this condition.

The petition alleged the conduct of both Mother and Father was contemptuous because the court "ordered from the bench on January 3, 2000," that Mother's contact with the children at Father's home was to be supervised by a third party. In addition to asking for criminal contempt sanctions against both parents, the petition also asked for a review of visitation forthwith and that unsupervised visitation with either parent be immediately suspended.

When DCS discovered Mother at Father's home with the children at approximately 6:30 p.m. on February 12 without Father or another adult being present, DCS immediately removed the

_____

[11]The Plans had called for 4 hours of visitation per month.

-7-

children from Father's home.[12]  Although we can find no order from the trial court granting DCS's request that unsupervised overnight visitation with Father be suspended, DCS allowed no further such weekend visits or any unsupervised visitation.

The order from the January 3 hearing was not entered until April 13, 2000, well after DCS's petition for contempt was filed, and that order does not recite any of the conditions alleged to have been placed on unsupervised visitation.  Again, our record does not include a transcript from the hearing itself.

Several attempts were made to set the contempt petition for a hearing.  The notes from the January 3 hearing indicate the next review was to take place on March 10.  Apparently on that date, some portion of the contempt petition was tried, but it was continued.  A later pleading by DCS confirms this interpretation of the record and indicates the hearing was not held on the date originally set for its continuance.  An order was entered setting the continued hearing for August 25, 2000, which was the date also set for a permanency planning review.  The record before us includes no indication a full hearing on contempt was held and includes no order from the court disposing of the petition.

On April 10, 2000, Mother gave birth to another son.  After an attempted but failed or rejected safety plan allowing the infant to stay with a neighbor, DCS filed a petition to adjudicate the infant dependent and neglected on April 27, 2000.  This petition was heard May 8, 2000, and the child was placed in the custody of DCS.  This order was entered June 23, 2000.[13]  A Permanency Plan for this infant was prepared and signed by Mother and Father at a staffing on May 30, 2000.  An order from the August 25 hearing reflects that the court reviewed the Plan at that time and approved it.[14]

The plan for the infant listed "Return to Parent" as the permanency goal.  The plan listed Mother's strengths as her bond to her children, love and concern for her children, stable housing and income, good housekeeping skills, and access to community resources.  Father's strengths included stable housing and income, his bond to his children, and his involvement with the Institute for Responsible Fatherhood and Family Revitalization.  The Plan required Father to take parenting classes; both parents to continue with the Institute to insure smooth reunification; both parents to

---

[12]The petition also recites an explanation given to the DCS worker by Mother and DCS's discovery that the information was false.  In addition, DCS pointed out in the petition that it suspected Mother had lied to the court at the January hearing when she told the court she was not pregnant.  Concerned about prenatal care for any child Mother might be carrying, DCS asked the court to determine whether Mother was pregnant.  The answer came with the birth of a child in April of 2000.

[13]There was actually a petition for temporary custody filed by the neighbor.  This petition was later dismissed. Father also filed a petition for temporary custody of this newest child, stating he was in the process of getting his other children, that he loved his children, and that he did not want them to be separated from each other.

[14] One copy of this plan reflects court approval on August 25, 2000, while another shows court approval on September 1, 2000.

maintain contact with the child and pay child support; and both to participate in homemaker services.

A hearing was held on August 25, 2000, that resulted in an order entered September 12, 2000. In the order, the court found "the State intends to pursue termination since the parents continue not to address the issues that are barriers to permanency for these children," even though a Permanency Plan for the infant was also approved that day with the goal of returning him to his parent(s). The trial court also stated it was concerned "that these children have been in custody so long without improvement on their issues." The court also found that the parents needed to demonstrate a commitment to getting their children back by addressing their issues. The court found that reasonable efforts were in progress and that a change of custody was not in the children's best interest at that time. Legal custody remained with DCS. The court also set child support for Father at $692 per month and for Mother at $537 per month.[15]

DCS prepared revised Permanency Plans and changed the goal of each Plan to adoption. Under parent or family strengths, DCS stated, "Parents have a long relationship and appear to be committed to each other at this point." The Plans continued to reflect that the children were bonded to or enjoyed visiting with their biological family. Among the "barriers to permanency"[16] listed was "Mother has not made a decision on housing, whether she will get her own or whether she should get on lease at father's home where she is currently residing." Mother was directed to decide what to do about housing and which children she desired to have living with her and to provide appropriate housing, appropriately furnished. The parents were directed to continue to get homemaker services on providing healthy meals for the children.

In addition, the Plans noted that Mother needed to attend counseling to address why she has left her children unsupervised on many occasions and to continue that counseling until the therapist recommended that all issues had been addressed. The Plans also directed that the parents needed to get caught up in their payment of child support. After noting that the children miss their siblings and their family, the Plans stated that the parents should follow the Plan's visitation section. That section stated that parents will continue to visit children for 2 hours every other week, will provide nutritious meals at the visits, and will interact individually with each child. DCS agreed to have all nine siblings visit together where possible.

In addition, the Plans stated that Father continued to be interested in getting custody of his children and:

At this point, he has been told that as long as Mom is not appropriate to get the children back, he is not appropriate either since they live together and Dad feels Mom did nothing wrong to cause the children to come into custody.

_____

[15]The record includes notices and orders of income assignments sent to Father's and Mother's employers with a notation to begin payments September 8, 2000.

[16]Since the permanent goal was changed to adoption, it is not clear how the listed items were barriers to that goal; they appear to be related to a goal of returning the children to the parent or parents.

The action steps needed from Father were stated:

> Father needs to consider whether he can actually take care of these children independently as at this point, the department does not think Mom could parent the children without feeling the continued need to leave them unsupervised.

And, Father was directed to continue to evaluate his situation with Mother and decide his plans to parent his children.

The plans identified psychological and behavioral problems with two of the children and a speech problem with another. Services were being provided to address these problems, and neither parent was assigned any responsibility with regard to these issues. This new set of plans was signed by Mother and Father on November 16, 2000.

DCS filed a motion for ratification of the newest Permanency Plans on February 1, 2001, which motion was apparently granted on February 9, but a hearing was set for April 17, apparently on the plans. A petition to terminate the parental rights of both Mother and Father to all nine children was filed on the same day as the court's approval of the latest Permanency Plans.

In the termination petition DCS alleged that: (1) pursuant to Tenn. Code Ann. § 36-1-102(1)(A)(i) and (iv) the parents had willfully abandoned the children in that they failed to support or make support payments for the four consecutive months immediately preceding the filing of the petition; (2) pursuant to Tenn. Code Ann. § 36-1-113(g)(3)(A) the children had remained in custody of DCS for more than six (6) months and the conditions which led to the removal still persisted; and (3) that the parents had failed to follow the Permanency Plans to remedy the conditions which necessitated the foster care placement.

The youngest child, who had been born after dependency and neglect proceedings were underway as to the other children, was adjudicated dependent and neglected on June 7, 2001, and the trial court set the trial on the termination of parental rights for July 9-10, 2001. A two-day trial with fifteen witnesses took place. Most of the information regarding the current situation of individual children was relayed through the testimony of the respective foster parents for the children and employees of the various agencies which offered services to the family. Mother and Father each testified. The guardian ad litem took an active role in the examination of witnesses. On October 3, 2001, the trial court entered an order terminating the parental rights of Mother and Father. The trial court's order states:

> The State of Tennessee filed its request to terminate the parental rights of these nine (9) children alleging that their mother and father had pursuant to T.C.A. 36-1-102 (1)(A)(i) and (iv) "willfully abandoned the children for more than four (4) consecutive months next proceeding the filing of this Petition in that the said defendants willfully for four (4) consecutive months immediately preceding the filing of this petition had failed to adequately support them.

The proof before the court shows that the children (except [the youngest]) had previously been adjudicated dependent and neglected on the 26th of October 2000 because of the mother's failure to address the children's issues and needs because she left them home alone and unsupervised with no way to contact her. The mother had not made adequate provisions for her children while she was gone. The investigation showed that this was not an isolated incident but a pattern of behavior on behalf of the mother. The father agreed to take the children overnight (the mother was immediately arrested on child neglect charges) but agreed that he could not provide for them on a long-term basis. The Court then found that at the time of the removal the Department had no less drastic alternative than to place the children in State's custody. [Father] had been declared the legal and biological father of all these children prior to the termination.

The father . . . attempted to regain physical custody of his children and the Court through the Department and other agencies offered him services so that he could successfully care for the children. Later, the children were removed from the father's possession because he continued to leave the children around their mother unsupervised even though he had been ordered by the court not to do so and he failed to cooperate with Court ordered services. The Court has been attempting for some time to work with the family to address their issues so that they could be reunited and function as a working family unit. The parents have not cooperated with Court ordered services.

In January of 2001 after several unsuccessful attempts to help the family and after the children had been in the custody of the Department since June of 1999, the Petition to Terminate Parental Rights was filed and presented to the court.

The testimony presented at trial shows by clear and convincing evidence that while the mother has made some limited improvement, she still does not appreciate the various individual problems of her children. Her statement regarding "all they need is to be home" does not show that she has insight into the counseling needs of several of the children and their medication needs. [Mother] refuses to accept responsibility for her actions and how they have impacted on her children. [Mother] appears not to understand the significance of counseling for [one of the children] who has made several disclosures of sexual abuse while he was living in his mother's home. [His] issues are so severe that it has been recommended by his Rape and Sexual Abuse Center counselor that he not be around his younger siblings and that he may need residential treatment to address his perpetration issues.

[Father] could not state to the Court the names and ages of his children, he stated that it was "just too many of them." Both [Father] and [Mother] thought that this was humorous, the Court did not. These are children he and [Mother] brought into the

-11-

world and these are children, individuals who have specific individual needs that need to be met by their parents.

The testimony and evidence further showed by clear and convincing evidence that neither parent had been consistent with visitation or financial support. Neither parent appeared to appreciate the need for consistent contact and positive influence from parents that children need to be mentally healthy and secure.

The Court will also note that at a previous Court hearing, when asked directly, [Mother] indicated that she was not pregnant, and later admitted that she was pregnant and expected to deliver in July of 2001. She stated that she had only recently started going to a doctor so that she could get prenatal care. This is the same pattern of behavior that [Mother] does not appear to appreciate the need and importance of prenatal care to address the needs that an unborn child may have in utero that will effect that child's development and quality of life. Neither [Father] nor [Mother] stated that they had any intent to continue with services that the children needed if the Court were to find that the children could return home. The parents stated that they believe the children's problems will clear up if they come home.

To say that due to the parents' low functioning abilities their rights should be terminated would not be fair to the hundreds of low functioning parents who function quite effectively as nurturing caring parents, unfortunately [Mother] and [Father] do not. Some of the children themselves have special needs. For the parents to leave them unattended or not recognize that services can help their children, sentences them to a life that will not allow them to reach their respective potential.

. . . .

The Department has established by clear and convincing evidence that both [Father] and [Mother] have failed to address issues that have been outlined in the Permanency Plans. Each child has specific needs and the parents should be able to understand what those needs are and be able to address those issues for their children. [Father] and [Mother] have not followed the Plans nor given plausible excuses as to why they have not.

The records of the Court and the testimony of the parents show that the least restrictive task they were to accomplish was to pay child support and visit consistently. The Court finds by clear and convincing proof that neither parent had paid any consistent support and none since the 8th of September 2000, some ten (10) months by the time of trial.

Additionally, the parents have failed to have meaningful visits and show that they can address each child's needs during the supervised visits.

This Court would find a termination on those combined issues along with the totality of circumstances and persistence of conditions that the parental rights of the parents should be terminated as to each child. The Court further finds that in the best interest of the children they should be freed for adoption so that they will be able to achieve permanency as quickly as possible.

. . . .

The testimony in this case also shows that since the children have been removed from their parents' home, their needs are being addressed, they are in counseling and making improvements developmentally, emotionally, and behaviorally.

This Court therefore finds that the termination is in the best interest of the minor children.

## II. Termination of Parental Rights

A parent has a fundamental right to the care, custody and control of his or her child. *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S. Ct. 1208, 1212-13 (1972); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174-75 (Tenn. 1996); *In Re Adoption of a Female Child*, 896 S.W.2d 546, 547 (Tenn. 1995); *Nale v. Robertson*, 871 S.W.2d 674, 678 (Tenn. 1994). This right is a fundamental but not absolute right, and the state may interfere with parental rights if there is a compelling state interest. *Santosky v. Kramer*, 455 U.S. 745, 747, 102 S. Ct. 1388, 1391 (1982); *Nash-Putnam*, 921 S.W.2d at 174-75.

Terminating parental rights has the legal effect of reducing the parent to the role of a complete stranger, "severing forever all legal rights and obligations of the parent." Tenn. Code Ann. § 36-1-113(*l*)(1). The United States Supreme Court has recognized the unique nature of proceedings to terminate parental rights, stating that "[f]ew consequences of judicial action are so grave as the severance of natural family ties." *M.L.B. v. S.L.J.*, 519 U.S. 102, 119, 117 S. Ct. 555, 565 (1996) (quoting *Santosky*, 455 U.S. at 787, 102 S. Ct. at 1412 (Rehnquist, J., dissenting)). As a result, "[t]he interest of parents in their relationship with their children is sufficiently fundamental to come within the finite class of liberty interests protected by the Fourteenth Amendment." *Id.* The constitutional protections of the parent-child relationship require certain safeguards before the relationship can be severed. *O'Daniel v. Messier*, 905 S.W.2d 182, 186 (Tenn. Ct. App. 1995). This most drastic interference with a parent's rights requires "the opportunity for an individualized determination that a parent is either unfit or will cause substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away." *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999).

Our legislature has established those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought, Tenn. Code Ann. § 36-1-113(g), and parental rights may be terminated only in those statutorily defined circumstances. *In re M.W.A.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Because the decision to terminate parental rights affects fundamental constitutional rights, courts must apply a higher standard of proof when adjudicating termination cases. *Santosky*, 455 U.S. at 769, 102 S. Ct. at 1403; *In re M.W.A.*, 980 S.W.2d at 622; *O'Daniel*, 905 S.W.2d at 186. To justify the termination of parental rights, the grounds for termination must be established by clear and convincing evidence. Tenn. Code. Ann. § 36-1-113(c)(1); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "This heightened standard . . . serves to prevent the unwarranted termination or interference with the biological parents' rights to their children." *In re M.W.A.*, 980 S.W.2d at 622.

> In order to be clear and convincing, evidence must eliminate any serious or substantial doubt about the correctness of the conclusions to be drawn from the evidence. *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992); *O'Daniel v. Messier*, 905 S.W.2d at 188. Such evidence should produce in the fact-finder's mind a firm belief or conviction as to the truth of the allegations sought to be established. *O'Daniel v. Messier*, 905 S.W.2d at 188; *Wiltcher v. Bradley*, 708 S.W.2d 407, 411 (Tenn. Ct. App. 1985). In contrast to the preponderance of the evidence standard, clear and convincing evidence should demonstrate that the truth of the facts asserted is "highly probable" as opposed to merely "more probable" than not. *Lettner v. Plummer*, 559 S.W.2d 785, 787 (Tenn. 1977); *Goldsmith v. Roberts*, 622 S.W.2d 438, 441 (Tenn. Ct. App. 1981); *Brandon v. Wright*, 838 S.W.2d at 536.

*In re C.W.W.*, 37 S.W.3d 467, 474 (Tenn. Ct. App. 2000); *see also Estate of Acuff v. O'Linger*, 56 S.W.3d 527, 537 (Tenn. Ct. App. 2001).

Thus, it was the burden of DCS to present "evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn by the evidence." *In re Valentine*, 79 S.W.3d at 539. Both Father and Mother assert this standard was not met. In this court's review, we must determine *de novo* whether DCS has proved their case by clear and convincing evidence. *Id.* at 536. Although members of this court have differed regarding how we are to apply the standard, *see In re Z.J.S. and M.J.P.*, No. M2002-02235-COA-R3-JV, 2003 WL 21266854, at *10 (Tenn. Ct. App. June 3, 2003) (no Tenn R. App. P. 11 application filed), we have concluded that the analysis used by our Supreme Court in *In re Valentine* governs our review. Consequently, first we will review the trial court's findings of fact *de novo* with the presumption of correctness accorded by Tenn. R. App. P. 13(d), and then determine whether the facts, either as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the grounds for termination. *In re Z.J.S. and M.J.P.*, 2003 WL 21266854, at *10.

DCS based its petition to terminate the parental rights of Mother and Father on several statutory grounds, including abandoning the children, failing to substantially comply with the

Permanency Plans, and persistence of conditions which prevent the children's return. The existence of any one statutory ground will support termination of an individual's parental rights. *In re C.W.W.*, 37 S.W.3d at 473. In addition, if a court, applying the appropriate evidentiary standard, determines that one of the grounds exists, the court must also find, using the clear and convincing evidence standard, that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c)(2).

### III. Proof of Grounds as to Father

At the time of DCS's first involvement, the children were living with Mother. Father was not allowed to live in Mother's public housing apartment, but he was a frequent visitor and was actively involved with the children, providing much of the care when he was there. He provided money regularly, bought food and supplies, took the boys for haircuts monthly, provided clothes and shoes, and otherwise supported the family. As explained earlier, when Mother was arrested for child neglect, DCS contacted Father and asked him to stay with the children. He responded immediately and remained with the children for several days until DCS decided he would not be allowed to remain in Mother's apartment and that his housing was not adequate for the children.

After the children went into DCS custody, Father quickly sought custody of the children. He has attended every court appearance and has continued to seek custody of his children. At the time of trial, Father was thirty-seven years old and had a ninth grade education.

Throughout DCS's involvement with this family, Father has been steadily employed. At the time of the trial, he was a line cook with a local restaurant where he had been working for about a year. He made $11 per hour. He had previously worked at another restaurant where he made $9 per hour. For a brief period of time, he held down two jobs. At the time of trial, he brought home approximately $600 every two weeks.

Father had been charged with a drug related offense in 1995, and was on community corrections, which required a monthly payment of $145 as well as additional costs totaling $800. The community corrections sentence also included a nightly curfew. He had recently moved to probation, for which there was no curfew and the monthly charge was $45.

Father had no car and no driver's license. He rode the bus to work and to most other places he needed to go. In addition to the many court appearances the record reflects he attended, he also attended permanency plan meetings, counseling, an M-team staffing, as well as required appearances or meetings related to his probation. He worked with the Institute for Responsible Fatherhood, attended parenting classes, consulted with a social worker, and talked to various day care providers. He worked with the HUGS (Help Us Grow) nurse who had been assigned to the family.

The homemaker services worker who worked with these parents stated the services were discontinued because Mother did not make herself available for the services. There were generally four appointments per month for the worker to visit the home; Mother was there only about half the time in the last six months or so. The worker testified that Father was there some of the time, but

generally he had to be at work, or leave for work. The appointments were at 8:00 a.m. The worker testified that, although she never discussed changing the time or date to accommodate Father's work schedule, that would have been impossible because of her other appointments. She also specifically testified that she did not consider Father as failing to cooperate with the services. She stated she really concentrated on Mother because Mother would actually be the one home with the children.

As he was instructed to do, Father obtained suitable housing for himself and the children. He was able to get a four bedroom apartment. His rent was $442 per month. His phone bill was $59 per month. He also furnished the apartment with items necessary for the children. Although there was some discussion at the trial about how much and what furniture he had at different times, DCS does not assert that he had not obtained suitable housing or furnishings.[17] Father rented furniture for some time, and bought some; he purchased linens and other essentials. He testified that he had spent approximately $3,000 to $4,000 on furnishings to provide a suitable environment for the children.

Father's intellectual functioning has been classified as mildly retarded. Father himself adamantly denied such a label at the trial and explained he had certain educational deficiencies because of his childhood experiences. DCS does not take the position that Father is functionally unable to parent these children; in fact the case worker specifically denied such a conclusion and stated:

> I wasn't really concerned with this because of his functioning, as far as him holding down a job, and when I would tell him things he seemed to relate well to me. He would - - - if I asked him to bring in documentation of anything, he would bring it back in. So I feel like he understood us working together to do what we needed to do. I didn't feel like that was a problem. He had housing. He had done the things that he needed to do, knew how to access the services.

The trial court also specifically found that the low intellectual functioning of the parents was not a basis for termination. Father's intellectual abilities, and the ways in which he is able to make up for those and function well in the world, are, however, relevant to some of the issues raised herein by DCS. In particular, DCS relies on Father's inability to recite the birthdays of all his children as some indication of his lack of involvement with them. Father testified he had a chart at home with all the birthdays listed. Similarly, Father was unable to name teachers or counselors working with his children. However, we note these children were in different foster homes, some in other counties, and attended school systems in those other counties. We also note that some of the foster parents who testified were similarly unable to come up with specific names.

When Father was questioned about a social worker or other potential service providers he had spoken with, he was sometimes unable to accurately name those persons. However, he

---

[17]We would note that in January of 2000 the court and/or DCS allowed weekend visitation at Father's home for only the three oldest boys. Those visitations were stopped. Nonetheless, Father was required to provide adequate housing and essentials for all nine boys.

invariably answered that he had the names written down in a folder he kept. He testified that he always wrote down things like that in case he forgot.

When questioned about how he would deal with the morning tasks and responsibilities associated with getting nine children off to school or daycare, he repeatedly replied that he would rely on a list or schedule, as well as generally describing the tasks involved. The HUGS nurse testified that she would be available to help him with organizing as well as performing those tasks and evening tasks as well.

The DCS case manager testified the parents were fairly consistent with visitation. An earlier caseworker for one of the children testified the parents were consistent in visitation and there was good interaction between the parents and the children and among the siblings. He also testified that Father was able to make special arrangements at work to attend a school function with his son. One child's social worker from another agency testified she observed family visitations, that they were loving, and that this child was normally excited to see his parents and siblings. The Permanency Plans for all but the youngest two children, including the Plans approved on the same date as the petition to terminate was filed, indicate that the children remained bonded to their parents and siblings and/or enjoyed visits with them.

The only negative testimony regarding visitation came from the caseworker who initiated the termination petition. She pointed to the requirement of the most recent Permanency Plans that the parents bring nutritious meals to the visits[18] and see that the children's basic needs, such as changing diapers, were taken care of during the visit. The caseworker testified that the parents had not complied with this requirement with regard to the diapers, and only "half and half" on the food. Father adamantly testified that he brought meals to the visits.

The caseworker also testified from notes she made as to specific visits. Since July of 1999, Father was late to two visits and missed two, one of which was rescheduled from its usual time because the children involved were going to be in town, and Father was at work.

Mother began living with Father in his four bedroom apartment in March of 2000. Mother testified she had applied for her own housing, but that she remained at Father's while waiting so that she could be there when the children visited. The two have discussed marriage, but Father was concerned about the effect of that marriage on his efforts to get custody of the children. That concern was apparently not misplaced since much of DCS's problem with Father is related to his relationship with Mother. Father testified he would give up his relationship with Mother if that was what was necessary for him to get his children back. Similarly, Mother testified she would move out if her living there was an impediment to Father having custody.

_____

[18]Apparently this requirement was inserted because some of the children had a long ride to and from their foster homes in another county. These visits generally took place at the DCS office. It is worth noting that this requirement did not appear until the plan signed by the parents on November 16, 2000, after DCS had decided to change the permanency goal to adoption. Nonetheless the DCS case manager testified about visits occurring prior to the insertion of this requirement.

In the most recent Permanency Plans, DCS stated that Father had done "most of what he needs to do." At trial, the caseworker agreed that that statement was true. When asked to reconcile that statement with her position that Father had failed to substantially comply with the plans, the caseworker testified:

> I got that from the fact - - thing that I found most important on this permanency plan he still did not have a grasp of and that was substantial to me as far as the permanency for these children, raising the children.

From the briefs and oral argument in this case, it is clear that DCS has two complaints against Father. The first is his payment of child support; the second is the fact that Mother was living with him in his apartment.

The facts regarding Father's child support obligation are not entirely clear from the record. It appears to us that Father was first ordered to pay child support by order whose entry date is not evident, but which references the July 27, 1999 hearing. It sets Father's monthly payment at $575 to be paid in installments every two weeks, and states the payments will begin August 15, 1999. The order specifically reflects there was no judgment for arrearages. The record includes numerous copies of a wage assignment notice sent to Father's employer reflecting the payments established in the order.

At the October 26, 1999 hearing, Father's child support obligation was suspended, except for payment on arrearages, and was subsequently terminated at the hearing on January 3, 2000, again except for payment on arrearages. In a March 23, 2000, order reflecting a November 24, 1999, hearing the court stated it would issue a separate order addressing the arrearage. We have found no order establishing the total amount of arrearage or the required monthly payments. At the trial, Father testified that the referee had told him to pay $25 every two weeks. We presume this was intended to apply to arrearages, since the same referee had suspended or terminated ongoing payments.

Appearing in the record as an exhibit introduced at trial, although not through a witness who authenticated it or explained it, was Father's payment history, a record from the juvenile court clerk's office. That record reflects that Father made $25 payments at various times from December 16, 1999 through February 17, 2000 and that he made a $200 payment on April 17, 2001. The record states the total paid as $275, although it is not apparent to us how this amount was arrived at.[19]

The court reinstated Father's ongoing obligation to pay child support in its order dated September 12, 2000, reflecting the hearing held August 25, 2000, wherein DCS indicated to the court it was changing the goal for the children from reunification of the family to adoption. The court set Father's obligation at $692 per month to begin payments on September 8, 2000. Wage assignment

---

[19]This record also reflects Father's total arrearage as of July 9, 2001, as $15,403.42. However, this figure appears to based on an inaccurate assumption that his obligation remained constant after it was first set.

-18-

notices were sent to Father's employer. Father testified that he twice asked his employer's bookkeeper if she had received notice from the court about deductions from his check and was told no. He made a $200 payment in April of 2000. At trial Father was still not certain of the amount of support he was to pay, maintaining that the referee had told him to pay $25 every two weeks. DCS primarily relies on Father's failure to pay support during the four months prior to the filing of the petition. His payments were reinstated to start September 8, 2000, and the petition was filed February 9, 2001.

With regard to Mother living in Father's apartment, DCS argues that this arrangement jeopardized Father's ability to provide suitable housing since he could be forced to leave if she was living there without being on the lease. However, the caseworker testified that she had informed the landlord of Mother's presence in the apartment. Father testified the landlord was aware of the situation, and his lease had not been canceled.

In addition, the DCS caseworker indicated some concern about Father's relationship with Mother because DCS had decided Mother had not demonstrated an ability to take care of the children, and DCS was afraid Father would leave the children in Mother's care.

We have reviewed all the statements in the Permanency Plans, including the latest one which was not approved by the court before the petition for termination was filed. We confess that we cannot discern from those statements exactly what Father was expected to do regarding his relationship with Mother. In the latest plan, DCS stated Mother needed to decide her future living arrangements and Father needed to continue to evaluate his situation with Mother and decide his plans to parent his children. At the same time, Mother had been instructed to find her own housing or get on the lease with Father. If she had done the latter, DCS would apparently still have had reservations about her living there as far as Father regaining custody of the children was concerned. At the same time, DCS had stated that the long term and stable relationship between Mother and Father was a family strength, and many of the services had been directed primarily at improving Mother's parenting with the idea she would be the primary caretaker.

### (1) Abandonment by Willful Failure to Support

The first ground relied upon by DCS for the termination of parental rights was abandonment of the children. Pursuant to Tenn. Code Ann. § 36-1-113(g)(1), in a termination proceeding abandonment occurs when:

> For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) either have willfully failed to visit or have willfully failed to support or make reasonable payments toward the support of the child.

-19-

Tenn. Code Ann. § 36-1-102(1)(A)(i).

The trial court found that the "testimony and evidence further showed by clear and convincing evidence that neither parent had been consistent with visitation or financial support and has abandoned their children." On appeal, DCS does not rely upon the failure to visit prong of the statute with regard to Father. That was a wise decision since we find the evidence preponderates against the trial court's finding that Father had not consistently visited the children.

DCS argues on appeal that both Mother and Father admitted their failure to pay support in the four months preceding the filing of the petition to terminate parental rights. Father and Mother both argue that abandonment by failure to support requires more than a finding that support has not been paid. They contend that abandonment requires an element of intent and that the trial court in this case did not find that they failed to pay support willfully or intentionally.

We agree that there must be an element of intent or willfulness in the failure to support. *In re Swanson*, 2 S.W.3d at 187. In that case, the Tennessee Supreme Court struck down as unconstitutional those portions of the statutory definition of abandonment that created an irrebuttable presumption of abandonment from failure to support for four months regardless of the intent or purposefulness of the parent, because those statutory definitions "simply do not allow for the type of individualized decision-making which must take place when a fundamental constitutional right is at stake." *Id*. at 188. Consequently, the Court held that "until otherwise amended by our legislature, the definition [of abandonment] that was in effect under prior law shall be applied." *Id.* at 189.

As explained in *Swanson*, that prior law included an element of intent in both failure to visit and failure to support. Essentially, abandonment was interpreted to require "conduct on the part of the parent which evinces a settled purpose to forego all parental claims to the child." *Swanson*, 2 S.W.3d at 184 (quoting *Ex parte Wolfenden*, 49 Tenn. App. 1, 5, 349 S.W.2d 713, 714 (1959)). A number of factors are to be considered in determining whether a parent has abandoned his or her child. *O'Daniel*, 905 S.W.2d at 187; *Koivu v. Irwin*, 721 S.W.2d 803, 807 (Tenn. Ct. App. 1986). The ultimate question is whether there is clear and convincing evidence of an overall lack of any parental responsibility. *Koivu*, 721 S.W.2d at 807.

Herein, Father admitted that he had not paid all of the child support that had been ordered by the court, but expressed some confusion as to the amount of the support and the method for paying the support. Although a wage assignment notice was sent to his employer after the last order establishing an ongoing support obligation, the support was not deducted from his check. In addition, a parent's ability to pay is a consideration in willfulness. *See* Tenn Code Ann. § 36-1-102(1)(B) (defining token support as insignificant given the parent's means). DCS continued to require Father to maintain suitable housing and furnishings for all the children. Obviously, the amounts spent on these items were also a form of support. After the trial, the guardian ad litem filed a written closing argument in which she argued that Father's failure to pay support in the four months preceding the filing of the termination should be considered in light of mitigating factors

such as the money he spent on furnishings and the court costs and other expenses he was required to pay as part of his community corrections sentence. We agree.

Father's conduct throughout this case does not evince a purpose to forego parental claims to his children or an overall lack of parental responsibility by the Father, even when measured by a lower evidentiary standard than clear and convincing. To the contrary, Father sought custody early on and has continued to seek custody. The only apparent and expressed reason DCS took the children in custody after removing them from Mother's home was the unsuitability of Father's current housing. We are left to infer that if he had had a bigger apartment or if he could have stayed in Mother's apartment with the children, they would have been left in his care. He has attempted to comply with directives given him by DCS, and DCS stated he had substantially complied with those requirements. He cooperated with workers and agencies that attempted to help him. Therefore, we reverse the trial court's finding that Father had abandoned his children.

### (2) Substantial Noncompliance

The second ground that DCS relied upon for the termination of Mother's and Father's parental rights was failure to substantially comply with the Permanency Plans. Father argues that DCS did not prove this ground by clear and convincing evidence. To the contrary, he argues that he substantially complied with the Plans. Tennessee Code Annotated § 36-1-113(g)(2) authorizes termination of parental rights when there has been substantial noncompliance by the parent with the statement of responsibilities in a permanency plan or a plan of care prepared pursuant to the provisions of title 37, chapter 2, part 4.

The standards for reviewing termination of parental rights based on Tenn. Code Ann. § 36-1-113(g)(2) have been discussed by the Tennessee Supreme Court in *In re Valentine*, 79 S.W.3d 539 (Tenn. 2002). Prior to terminating a parent's rights on this ground, the trial court must find that the requirements of the permanency plan that the parent allegedly did not satisfy are "reasonable and are related to remedying the conditions which necessitate foster care placement." *Id*. at 547 (quoting Tenn. Code Ann. § 37-2-403(a)(2)(C)). If the trial court fails to make this finding, this court must review the trial court's decision *de novo* without a presumption of correctness. *In re Valentine*, 79 S.W.3d at 547. Determining whether substantial noncompliance exists is a question of law that must also be reviewed without a presumption of correctness. *Id.* at 548.

In order for noncompliance to justify the termination of parental rights, it must be "substantial." In other words, mere technical noncompliance alone is not sufficient to justify the termination of parental rights. *Id.* at 548. Noncompliance with requirements in a permanency plan that are neither reasonable nor related to remedying the conditions that led to the removal of the child from the parent's custody is not relevant for purposes of Tenn. Code Ann. § 36-1-113(g)(2). *In re Valentine*, 79 S.W.3d at 548-49. Additionally, the parent's degree of noncompliance with a reasonable and related requirement must be assessed.

In the order terminating parental rights, the trial court herein did not directly address the reasonableness of the requirements of the three Permanency Plans or the relationship of those requirements to the reasons that led to the removal of the children. The trial court had previously approved the plans with a finding that the requirements were reasonably related. The third set of Permanency Plans was submitted to the court one week prior to the filing of the termination petition, the court approved the plans on the date the petition was filed, but set the plans for a hearing. However, the trial court's finding that a requirement is reasonable and related to remedying conditions necessitating foster care must be made in conjunction with the determination of noncompliance. *Id*. at 546. Absent that, this court must make the determination *de novo*.

The first Permanency Plans, created soon after the children were placed in DCS custody each named the permanency goal as "return to parent." The Permanency Plans set the goals for Father as: (1) pay child support; (2) participate in raising his children; (3) demonstrate his ability to hold a full time job; and (4) secure adequate housing to support his family. The initial plans were re-written by DCS on December 10, 1999. The ultimate goal remained return to parent at that time. These Permanency Plans did not change the requirements for Father, but listed several strengths of the Father, including demonstration of the depth of his relationship with the children. These Plans also found Father had acquired housing with most of the necessary furnishings.

These updated Permanency Plans also recognized that a stressful adjustment period would follow any return of custody to the parents. It also noted, "Mom and Dad are unsure of their future plans as a couple. They do not have a common goal on how they will parent the children as a team when the children are no longer in foster care."

DCS revised the Permanency Plans for the third and final time by changing the goal to adoption. Although the permanency goal changed, the revised plans continued to list the strengths of Mother and Father (such as their long and committed relationship and their enjoyment of visits with the children) and continued to list barriers to permanency, which we interpret as barriers to reunification of the family. Listed as a barrier was Mother's lack of decision on her housing. The Plans directed Mother to decide that and other issues and directed Father to continue to evaluate his situation with Mother.

Regarding Father, the DCS case manager testified that Father had complied with the Permanency Plans by paying some child support, maintaining stable employment, and having a parenting assessment, but that he did not secure a safe environment for the children because although he secured adequate housing, he allowed Mother to live with him when her name was not on the lease, jeopardizing his housing situation.

We find that Father substantially complied with the specific requirements assigned to him by the Permanency Plans. The only real argument DCS makes with regard to Father's noncompliance is that his ability to retain suitable housing was jeopardized by his allowing Mother to live with him without being on the lease. The evidence does not support this position, since DCS

informed the landlord of the situation, and the landlord did nothing in response. No evidence was presented regarding a real threat to Father's housing.

DCS's statements in the various Permanency Plans do not evince a clear direction for Father to take with regard to his relationship with Mother. DCS did not tell him to make Mother move out and, in fact, implied that it would be acceptable for Mother to add her name to the lease. The latest Plans, on which there was no hearing before the trial court,[20] directed Father to consider his relationship with Mother, but did not indicate what the right decision would be and did not direct any particular action be taken as a result of that consideration. Thus, we cannot find that Father failed to comply with any specific requirement of even the last set of Plans.

Consequently, we reverse the trial court's finding that Father failed to substantially comply with the requirements of the Permanency Plans.

### (3) Persistence of Conditions Preventing Safe Return to Home

The final ground for the termination of parental rights relied upon by DCS was persistence of the conditions which led to the removal under Tenn. Code Ann. § 36-1-113(g)(3)(A), which authorizes termination of parental rights if:

The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

(i) The conditions which led to the child's removal or other conditions which in all reasonable probability would cause the child to be subjected to further abuse or neglect and which, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;

(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

(iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

There is no dispute that the children had been removed from Mother's home and from their parents' custody for over six months. The conditions which led to their initial removal were Mother's neglect of the children as evidenced by her leaving them unsupervised and her failure to meet the nutritional needs of at least one of them. With regard to Father, the only condition that

---

[20]*See* Tenn. Code Ann. §37-2-409 regarding periodic subsequent hearings.

prevented him from gaining custody immediately after Mother was arrested appears to have been his lack of housing and furnishings to accommodate all the children.

The DCS caseworker testified that the conditions which led to the removal had persisted by noting that the parents were allowed to have unsupervised visitation with their children for a short time, but that the visitation had to be changed to supervised due to Mother being left alone with the children after the parents were explicitly told that she was not to be alone with the children. Overall, she testified that her concern with Father was his failure to recognize the reason for removal.

As DCS maintains, the existence of conditions other than those initially requiring removal can prevent a return to the parent's custody, and thus constitute grounds for termination, but those conditions must be such that "in all reasonable probability would cause the child to be subjected to further . . . neglect." DCS expressed generalized concern about Father's ability to actually parent all of the children and had stated in its latest set of Permanency Plans that Father should consider whether he could actually take care of the children independently.

When asked regarding her concerns about Father's parenting of the children, the DCS caseworker testified, "I think he is very concerned with the children and would like to parent the children. I don't know how realistic this is with what he would be able to do since he's got to work and hold down a job . . . ." In addition she stated that she did not feel that Father believed there was anything wrong with how Mother had parented the children in the past. She further testified that this was her primary concern and remained her concern because Father was still in a relationship with Mother and still supportive of her.

Thus, DCS basically had two concerns regarding return of the children to Father: his ability to actually parent and meet the needs of nine children and his continuing loyalty to Mother. With regard to the first, the record indicates that DCS's efforts at providing nutritional and homemaking services and training were focused on Mother, not Father. Father attended parenting classes and worked with various groups or service providers. The HUGS nurse testified she would help Father with attending to the numerous tasks that would be involved in parenting the children.

We cannot conclude that there was clear and convincing evidence that Father was unable to care for the children or that he would not be able to provide such care with training and help. Additionally, while the court and DCS emphasize the specialized needs of some of the children,[21]

---

[21]After the children went into foster care, some of them developed or displayed behavioral, educational, or emotional problems. In particular, one child suffered serious behavioral and emotional difficulties that required at least weekly counseling. This child's condition was later attributed to sexual abuse by Mother's oldest son while the child in question lived in Mother's home. At trial, the therapist testified this child needed intensive treatment in a residential setting. DCS and the trial court emphasized that the parents, especially Mother, needed to, but did not, recognize the individualized special needs of this child. This child and the others had been removed from Mother for two years, and his problems had evidenced themselves after that removal. We note that the child had missed over one-third of his scheduled weekly therapy sessions while in foster care and that neither parent had any responsibility to get him to those

(continued...)

they do not engage in such individualized analysis with regard to Father's parenting abilities as to each child, considering that child's age, abilities, and needs. With additional services to Father and some additional opportunity for him to demonstrate his parenting ability on a gradually increasing scale of responsibility, Father may be able to parent these children or some of them.[22] In any event we cannot conclude that with that help Father's abilities will probably result in neglect of the children.

With regard to DCS's second concern, we cannot conclude that Father's feelings toward Mother constitute a condition that probably will result in neglect of the children by Father, especially since DCS repeatedly stated that a strength of the family was the long and committed relationship between Mother and Father. Father testified as to his understanding of why the children were removed from Mother and why her leaving them alone was wrong. He also testified he would sever his relationship with Mother if that were a requirement of his getting his children back.

DCS's real concern appears to be that Father will leave the children in Mother's care and she will neglect them. While we do not question the sincerity of that concern, the record does not show Father was ever made to choose between his relationship with Mother and the hope of a relationship with his children until the trial. When asked to make that choice at trial, his answer was unequivocal.

DCS argues that Father left the three oldest children in Mother's care during an unsupervised visit at his home. Father testified he went out to pay a bill, using the bus for transportation, and left his adult daughter at home with Mother and the boys. Whatever the true facts, Mother was the only adult in the home with the three children at approximately 6:30 p.m. on a Saturday. Mother did not leave the children unsupervised; she did not neglect them; thus, she did not repeat the conduct leading to the children's removal. Father was never given another opportunity to demonstrate he would make sure the situation of Mother being left alone with children did not occur again. While we do not condone or approve of Father's allowing a situation to occur that he had been warned against, we cannot conclude this one incident justifies a conclusion he would allow it again if it is a condition of his retaining rights to any relationship with his children. We also cannot conclude it constitutes a condition that would probably result in the children's neglect.

We hold that the trial court erred in terminating Father's parental rights because the existence of any one ground for termination was not proved by clear and convincing evidence. Accordingly, we reverse the judgment terminating Father's parental rights.

---

[21](...continued)
appointments.

[22]The children are not all in the same foster home; one was in need of residential therapeutic services; there was no potential adoptive home for all the children. In other words, they are not currently together, and the record reveals no plan for them to stay together, absent return to custody of one of the parents.

## IV. Proof of Grounds as to Mother

As of the date of trial, Mother was thirty-one years old. She had borne eleven children and was nine months pregnant with her twelfth. She did not have a high school diploma or GED and left school in the eleventh grade due to her first pregnancy. When DCS became involved with the family, Mother was not employed outside the home.

DCS alleged the same three grounds against Mother. For the same reasons set out earlier with regard to Father, we find DCS did not prove by clear and convincing evidence that Mother had abandoned these children.

### A. Substantial Compliance with Permanency Plans

With regard to whether Mother substantially complied with the requirements of the Permanency Plans, we analyze that issue following the Supreme Court's analysis in *In re Valentine*. We must examine each requirement that Mother is alleged to have failed to comply with to determine if that requirement was (1) specific, (2) reasonable, and (3) related to remedying the conditions that necessitate foster care placement because the trial court did not make those findings at the same time it determined the issue of substantial noncompliance. 79 S.W.3d at 546.

Although the trial court found that Mother had "failed to address issues" outlined in the plans and that she had not followed the plans nor plausibly explained her noncompliance, the court made specific factual findings only as to two requirements. First the court found Mother did not pay child support and visit consistently. Only these findings are reviewed with a presumption of correctness. *Id*. at 546. The evidence preponderates against the finding Mother failed to visit consistently. The Permanency Plans placed no responsibility on Mother to pay child support. The last revised set of Plans required Mother to get caught up on payment of support.

The first Permanency Plans, created soon after the children were placed in DCS custody, set requirements for Mother including: (1) take parenting classes; (2) provide appropriate housing and furnishings; (3) learn nutritional standards; (4) complete a psychological examination and follow recommendations for medication and counseling; (5) cooperate with Homemaker Services and learn purchasing and decision making skills; (6) obtain a GED and secure employment; (7) secure day care for the children; (8) continue to work with the HUGS nurse; (9) participate in WIC; (10) secure medical treatment for the children, including immunizations; and (11) attend to her own physical health and receive treatment for anemia. The second set of Plans did not change the statement of requirements for Mother. The third set recognized the failure of Mother to begin a counseling program or address the issues which brought the children into custody and her failure to pay child support.

To constitute a basis for termination of parental rights, a permanency plan requirement must be specific. We consider the requirement that Mother provide adequate housing for the children, as that requirement was interpreted by DCS during its involvement with the family to lack the requisite

specificity. Both Father and Mother had initially been required to provide suitable housing for all the children. As discussed above, DCS appeared to approve Mother's living in Father's suitable housing at one time, but later determined Mother should not live there. In the last set of revised Plans, Mother was told to decide on whether to get her own housing or to get on the lease at Father's house. The testimony of the DCS case manager at trial made it clear that even the lease arrangement would not have allayed her other concerns. Again, DCS's equivocation on a suitable housing arrangement provided no specific requirement for Mother to follow other than to decide. We cannot find that Mother did not substantially comply with a specific requirement of the Plan regarding housing.

Unless a requirement is reasonable and related to remedying the conditions necessitating foster care, compliance or noncompliance with that specific requirement is irrelevant to whether the ground of substantial noncompliance with the permanency plan has been proved. *In re Valentine*, 79 S.W.3d at 547. We find that the requirement that Mother obtain a GED was not related to the conditions that led to removal of the children or to remedying conditions that required that the children remain in foster care. *Id.* Consequently, we will not consider DCS's argument that Mother failed to comply with that requirement.

The other requirements, however, appear to us to be related to remedying the conditions that necessitated foster care placements. Mother had several children who failed to thrive, and one of the triggering events that led to DCS involvement with the family was the undernourished condition of the infant. Many of the Plan requirements address themselves to these problems by attempting to train Mother to recognize the nutritional needs of the children and to plan for and provide food meeting those needs. Other requirements were addressed to Mother's conduct in repeatedly leaving the children alone unsupervised.

Mother attended parenting classes, and although the DCS case manager was not satisfied that Mother demonstrated sufficient improvement in her parenting skills, for purposes of the ground of substantial noncompliance, we find Mother complied with the specific requirement that she attend parenting classes.

The requirements that Mother learn appropriate nutritional, purchasing, and decision making skills were to be accomplished through her work and cooperation with the parenting classes, Homemaker Services, and the HUGS nurse. Mother somewhat cooperated with the HUGS nurse early on, and that person provided assistance in a number of areas.[23] Mother became more cooperative with the nurse later on. According to testimony of the nurse herself, Mother complied with the requirement that she cooperate with HUGS.

---

[23]For example, the nurse testified that at the beginning the children had different medical care providers located in various areas, creating a real difficulty for Mother, who had no car and no driver's license, to make and keep doctor's appointments for the children. The nurse was able to work through the TennCare provider to remedy this situation and get all children assigned to one doctor.

Homemaker Services were discontinued because Mother did not make herself available and was not at home for half of the scheduled appointments. Mother testified that her participation with Homemaker Services involved her working and the homemaker watching her work. She testified that she could not complete some of the tasks required by the homemaker, especially cooking, because there were no children in the house to cook for. It is clear that at some point Mother simply chose not to make an effort with Homemaker Services. Mother only partially complied with the requirement that she cooperate with Homemaker Services.

The DCS case manager testified that although Mother's understanding of proper nutrition may have improved, Mother's efforts to provide nutritional meals or food at the visits was inconsistent.[24] Her observations were based upon the every other week supervised visits, lasting approximately two hours each. The third and final set of revised Plans, changing the goal to adoption, stated the following in regard to barriers to permanency:

> Parents have not demonstrated knowledge of how to provide a well-balanced, nutritious meal for their children during visits. They are fed junk food and soda instead of vegetables and milk and other more nutritious foods. Mom says she is just feeding the children what they want to eat, and that they don't like milk. This is a BIG concern since 3 of the children were found failure to thrive in the past. It is also a concern since this CMII [social worker] personally witnessed the 1 year old consistently given other things besides formula in his bottle, i.e. Jungle Juice, water, etc. in his infant years. . . .

However, the DCS case manager testified that compliance with the requirement to provide nutritional food was met "half and half."

The HUGS nurse, who had been a registered nurse for thirty years, had worked with Mother and Father consistently and intensively since DCS first became involved with the family. She got the children assigned to the same doctor; she transported them to appointments; she got them on the WIC program, all before the children were removed from the home. In addition, the HUGS program involved teaching parents to care for their children, including safety and nutrition issues. She believed that it was important to train parents or refresh earlier training on these and other issues while the children were in the home.

The HUGS nurse testified that from the beginning Mother was fairly cooperative, although she may have been unable to keep some clinic appointments, and that her relationship with Mother was good. She also testified that Mother had improved over time as evidenced by the fact that she

---

[24]We are aware that Father was also assigned responsibility, in the last set of Plans, for providing meals at visitation and attending to the individualized needs of the children at the visits. However, DCS did not allege Father had failed to meet these specific requirements. In addition, the DCS case manager testified that Mother had been verbally instructed prior to the last set of Plans to bring meals to visits and Mother had been the focus of services directed to meeting the nutritional and other needs of the children. In other words, DCS primarily held Mother responsible for these tasks, not Father.

had taken better care of her own health even after the children were removed. She also testified that before the children were removed from the home she would often stop by Mother's home in the afternoon and Mother would be cooking nutritious meals. The nurse testified that she believed that Mother could parent her children.

Since one of the primary concerns was whether the children would receive proper nutrition if they were returned to Mother's custody, compliance with the requirements designed to ensure Mother could take care of the children's nutritional needs was important. However, the evidence shows that Mother complied or partially complied with the specific requirements related to nutritional training.

Mother was specifically required to get a psychological evaluation and follow its recommendations for counseling. She got the evaluation, but never received counseling. There was dispute at trial as to the cause. Despite a diagnosis of possible depression from the evaluator, the treatment agency notified DCS that "Based on the information at intake as well as the information you faxed to me, [Mother] does not have a mental health diagnosis that would enable her to receive psychiatric/psychotherapy services utilizing her Tenn. Care." In addition, Mother had told the agency she did not know why DCS sent her there and could not identify any type of counseling she might need. Thus, the agency also notified DCS

> [Mother] seems disinterested in pursuing said services. [She] was unable to identify issues to address in treatment here. Although [Mother] is certainly welcome to pursue services at Dede Wallace Center should she decide on issues she would like to address in treatment, it seems ill advised at this point that she continue services here. In my professional opinion, having a client receive services who both does not want the services and cannot indicate issues she would want to address in treatment, the services are not warranted. My concern is that such an arrangement lends the appearance that a client is genuinely invested in making changes in treatment when that may not be the reality.

The author of this letter to DCS testified at trial that her conclusion that there was no diagnosis justifying mental health services was based upon Mother's statements to her. She assumed the evaluation was not one of the items faxed to her, but the case manager testified it was faxed. The Dede Wallace intake worker also testified that the primary reason no services were offered to Mother was that Mother could not identify a reason for wanting any services.

The counseling was considered important by DCS in getting Mother to understand the problem with leaving her children unsupervised and to address conditions that may have contributed to that conduct. That is why the original Plan noted as a barrier that Mother needed a "psychological examination to determine any underlying causes that contribute to her inability to effectively parent her children." However, the specific action Mother was required to take was to have an examination, which she did, and to follow any recommendations of that evaluation for counseling. DCS failed to prove that Mother was aware that the evaluation recommended counseling; the agency that would

provide the counseling found no diagnosis justifying treatment; and DCS did not show that it informed Mother that the examiner recommended counseling.

In fact, it is difficult to interpret as a diagnosis the examiner's vague "provisional impression" of depression, statement that Mother "may be more depressed than she admits to herself and others," and hypothesis that she may have more depression than she evidenced at the evaluation. Further, the recommendation section merely states in this regard that Mother "may benefit from on going counseling services with a provider who is culturally competent to work with her." No explanation is given that directly relates to the hypothesized depression or to the reasons the children were removed from the home.[25] Mother testified she told the Dede Wallace intake worker that she did not know what issues she was supposed to work on, what her needs were, or the specific purpose for the DCS referral. She never said she did not want counseling. Based upon these facts, the evidence does not support a finding that Mother failed to comply with the original requirement that she obtain counseling recommended as a result of the examination.[26]

Mother was under court order to pay child support. She paid little or none even though she was employed during most of the two years her children were in DCS custody. Mother admitted to failing to pay support, except she seemed to think Father had paid support on her behalf sometime after the petition was filed. She was not employed at that time and was living with Father who was supporting the two of them. Mother admitted that she had not been employed for two months by the time of trial, apparently related to health reasons stemming from her pregnancy. She said she intended to return to work in the future. Mother also testified that she had purchased some of the furnishings needed to provide a suitable home for the children.

While Mother was under court order to pay support, such payment was not a requirement of the two initial Permanency Plans. In fact, the Plans discuss Mother's status as a single mother of eight who needed financial support from Father. Father was required to provide financial support. In the last revision of the Plans, DCS stated that both parents needed to get caught up in their payment of child support. That is the first and only reference in the Plans to any requirement placed

---

[25]We note the recommendations also included a statement that Mother would continue to need more than a minimum amount of time, attention, guidance and support from DCS. The report found Mother to have deficient to average mental abilities, and her insight, reasoning and judgment to be fair. It also noted Mother appeared fatigued and overwhelmed by her situation. As Mother stated at trial, the fact her children had been taken away was enough reason for anyone to be depressed.

[26]The third set of revised Permanency Plans noted as a barrier that Mother still had not started her counseling and had not addressed the issues that brought the children into custody, leaving DCS to conclude that without progress by Mother in recognizing the part she had played in losing custody it could not determine it would be safe for the children to return home "as far as her being trusted to not leave the children unsupervised in the future." The Plans assigned to Mother the task of attending counseling "to address why she has left her children unsupervised on many occasions." Mother signed these Plans on November 13, 2000. At the trial Mother did not testify she had sought the counseling. The DCS case manager testified that DCS took the position that Mother would leave her children unsupervised because she had not had any counseling to deal with why she did it in the first place. We consider this position to be related to the persistence of condition ground discussed hereafter.

on Mother to pay support. It could not have been in the reasonable contemplation of DCS that Mother could pay off her substantial arrearage in the three months between her signing the revised Plans and DCS filing the petition to terminate. Consequently, Mother did not fail to substantially comply with the Plans.

DCS does not rely on the other specific requirements, and does not argue that Mother failed to comply with them, including securing employment, securing daycare for the children, and attending to her own health.[27]

Based upon our factual findings, we cannot conclude that Mother failed to substantially comply with the specific requirements of the Permanency Plans.

## B. Persistence of Conditions

DCS has concerns that conditions exist that prevent the safe return of the children to the parents' custody in the near future. If those conditions do exist, such that they **in all reasonable probability** would cause the children to be subjected to further neglect, and if there is little likelihood those conditions can be remedied in the near future, termination may be based on such conditions if failure to terminate diminishes the children's chances of integration into a permanent home. Tenn. Code Ann. § 36-1-113(g)(3)(A).

Most of the evidence and arguments put forth by DCS are appropriately considered under this ground because it is really DCS's concerns about the ability of the parents to provide a safe and nurturing home that is the driving force behind this action. These concerns are also the primary basis for the trial court's rulings.

DCS has voiced its concern that Mother has not really acknowledged responsibility for the children ending up in DCS custody. It is concerned she has not addressed any underlying problems or conditions that might have led her to leave the children unsupervised. Apparently this refers to her failure to get counseling.

DCS's position implies that the two sets of parenting classes Mother completed and her work with the Institute for Responsible Fatherhood, Home Services, HUGS, and others would not have addressed the importance of supervision for young children. It also implies that Mother has not come to realize that importance through her children being removed and her meetings with DCS.

---

[27]Mother went through two pregnancies after DCS became involved, did not disclose but instead hid her condition, and did not get prenatal care until late and at the insistence of DCS or the HUGS nurse. At trial, Mother admitted to previously lying to the court about being pregnant with the ninth child. The HUGS nurse testified that Mother had been taking better care of herself for the last year. Her hemoglobin level was no longer low. Mother had been without TennCare benefits for some period of time. Mother had been taking Depo-Provera shots for birth control until her benefits expired.

DCS has not proved that any specific counseling would have eliminated the possibility that Mother would not leave young children unsupervised. Such counseling may have alleviated DCS's concerns, and for that reason if no other, Mother would have been well advised to get it. However, there is not sufficient evidence in the record to conclude that Mother's failure to obtain counseling would in all reasonable probability lead to neglect of the children if they were returned to her. The only time Mother has been alone with any of her children, she did not leave them. She has not had another opportunity, even a short unsupervised visit, to demonstrate her former conduct will not recur.

The other concern DCS has about Mother is whether she can provide appropriately nutritious meals on a consistent basis and otherwise take care of the needs of the children. Even the DCS case manager acknowledged that Mother's knowledge of such matters may have improved, but also stated that Mother had actually demonstrated any improvement inconsistently. These observations were based on short visitation periods every two weeks. The testimony of the HUGS nurse contradicts any conclusion that Mother was not able to provide nutritious food. Further, that nurse's testimony that if the children were placed in the home she would be able to continue to provide services until the youngest child in the home was six years old and would be able to monitor the health of the children and whether they were receiving appropriate care should have allayed the "concerns" of DCS.

There is not clear and convincing evidence that Mother's ability to provide for her children's nutrition needs is so inconsistent as to make it probable they would be neglected if returned home. Consequently, DCS has failed to establish the ground set out in Tenn. Code Ann. § 36-1-113(g)(3)(A).

## V. Conclusion

The trial court emphasized the individual needs of the children and especially those three children with special needs related to developmental, behavioral, and emotional or psychological problems. We agree with the court that these children must be given the care and services they need. We cannot conclude from the evidence, however, that either of the parents is incapable of understanding the individualized needs of these children and of making sure those needs are met by service providers.

The children at issue displayed their problems after they were placed in foster care. Mother and Father have seen the children only briefly every two weeks since their removal. They have not observed the problematic behaviors themselves. They have been told, through the Permanency Plan meetings and otherwise, of the special needs of three of their children. The DCS case manager testified that Father was concerned about the problems and talked to his children about school progress and behavioral issues.

It is difficult to understand what expectations the trial court or DCS had with regard to the parents addressing the special needs of any of their children. Those children were living in various

foster homes, some in other counties, and were receiving the services that had been identified as needed. The parents were given no responsibility regarding these services. They were implicitly criticized for failing to contact counselors or others more frequently, but stated they got most of their information from DCS or foster parents.

Of course, DCS must be concerned that all the children receive the care they need and any specialized services they require. Evidence regarding these needs, including a possible residential placement for the child with the most serious problems, and regarding the children's experience and development in foster care, was provided and considered in the context of the best interest analysis. Unless a ground for termination is proved by clear and convincing evidence, consideration of best interests is not appropriate.

The evidence regarding any individualized needs of the children did not establish any ground for termination. There is no reason established in the record to conclude that if properly prepared and supported these parents, or one of them, cannot ensure any special needs of the children are met. There is also no reason to believe DCS would allow a return to either parent's custody if a situation existed that might endanger a particular child.[28]

While we agree that individualized needs of each child must be recognized and addressed by the parents, it appears neither the court nor DCS engaged in such an individualized approach in analyzing the situation of each parent and each child. The various ages, abilities, and bonded relationships of the children require such an examination.

This court deals with no issue of greater importance than termination of parental rights. There is no more significant action by the State in the context of civil proceedings. We are deeply aware of the gravity of any decision we make in these cases. We have given thorough consideration to the entire record in this case and to each argument propounded by the parties. Our decision is based upon our conclusion that DCS failed to meet the substantial evidentiary burden placed upon it by the United States Constitution and the courts.

We reverse the trial court's judgment terminating the parental rights of Father and of Mother and remand for further proceedings. Our decision does not affect custody of the children. That decision is left to the trial court herein. *In re Valentine*, 79 S.W.3d at 550. DCS remains under a responsibility to make reasonable efforts to provide Father and Mother, individually, with the tools each will need and the opportunity for each to demonstrate the ability to provide a safe, stable, and

---

[28]Mother testified her son who was sexually assaulted has never told her himself about that abuse or the perpetrator. She also testified that she saw no problem in allowing her oldest son, the alleged perpetrator of the abuse, to return home even if the abused child were there. Obviously, DCS can prevent such a situation arising if it would endanger the child.

nurturing environment for the children. If the facts at the time warrant it, another petition for termination can be brought later. We encourage DCS and the trial court to consider each child, and each parent's rights to each child, on an individualized basis. Costs of this appeal are taxed to the Department of Children's Services.

_____
PATRICIA J. COTTRELL, JUDGE